```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                         SHERMAN DIVISION

 3    UNITED STATES OF AMERICA,          §
                                         §
 4                  Plaintiff,           §
                                         §
 5                  vs.                  §    Case No.:
                                         §    4:21-cr-00253-ALM
 6    EDGAL IRIBHOGBE, et al,            §
                                         §
 7                  Defendants.          §

 8
            TRANSCRIPT OF EXCERPT OF JURY TRIAL PROCEEDINGS
 9                        CLOSING ARGUMENTS
            BEFORE THE HONORABLE AMOS L. MAZZANT, III
10                   UNITED STATES DISTRICT JUDGE

11            Wednesday, March 13, 2024; 11:16 a.m.
                          Sherman, Texas
12

13    APPEARANCES OF COUNSEL:
      (Continued on page 2.)
14
      FOR THE PLAINTIFF:
15
       Heather Harris Rattan
16     Anand Varadarajan
       OFFICE OF THE U.S. ATTORNEY - Plano
17     101 East Park Boulevard, Suite 500
       Plano, Texas 75074
18
      FOR THE DEFENDANT IRIBHOGBE:
19
       Phillip A. Linder
20     3300 Oak Lawn Avenue, Suite 700
       Dallas, Texas 75219
21

22         *******************************************

23              GAYLE WEAR, RPR, CRR
              Federal Official Court Reporter
24                 7940 Preston Road
                  Plano, Texas 75024
25            Gayle_wear@txed.uscourts.gov
```

```
 1    APPEARANCES OF COUNSEL:
      (Continued from page 1.)
 2
      FOR THE DEFENDANT ADEOYE:
 3
      John Hunter Smith
 4    WYNNE, SMITH & YOUNG, PLLC
      707 West Washington Street
 5    Sherman, Texas 75092

 6    FOR THE DEFENDANT CHIAGOZIEM OKEKE:

 7    James P. Whalen
      Ryne T. Sandel
 8    9300 John Hickman Parkway, Suite 501
      Frisco, Texas 75035
 9
      FOR THE DEFENDANT CHIDINDU OKEKE:
10
      Rafael De La Garza
11    6521 Preston Road, Suite 100
      Plano, Texas 75024
12

13

14                          *    *    *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2     PROCEEDINGS:                                    PAGE



 4
       CLOSING ARGUMENTS:
 5
           By Mr. Varadarajan                            4
 6         By Mr. Linder                                45
           By Mr. Smith                                 63
 7         By Mr. De La Garza                           80
           By Mr. Whalen                                86
 8         By Ms. Rattan                                99

 9

10

11                          *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   March 13, 2024                                    11:16 a.m.

 2                          ---o0o---

 3                     P R O C E E D I N G S

 4                          ---o0o---

 5        THE COURT:  Okay.  Bring the jury in.

 6        (Jury enters the courtroom.)

 7        THE COURT:  Please be seated.

 8             Welcome back, ladies and gentlemen.  It is now time

 9   for closing arguments.  And again, as I think I told you

10   yesterday how long each side has, so this will take, you

11   know, multiple hours to complete those.  But pay attention.

12   What the attorneys say isn't evidence, but they're going to

13   summarize what they believe the evidence has showed you and

14   the inferences that can be drawn from that.

15             Of course, the government always has the burden, so

16   they get to go first; and they'll be able to conclude after

17   the defendants make their closing arguments.

18             So who's going to go first?  Okay.

19             MR. VARADARAJAN:  Thank you, Your Honor.  May it

20   please the Court, counsel, members of the jury.

21             Hopes, expectations, and trust -- not the words on

22   the screen, but those three words, they mattered to the

23   victims in this case.  You see, each one of them had the hope

24   that the person they met online, that they were special,

25   offer some companionship, love, and, some cases, a business
```

1    opportunity.

2         The expectation was that they weren't being lied

3    to; that the person they were dealing with was real, real

4    people with real families and real issues.

5         And the trust was that when these victims sent

6    these people money, it was going to be used for its intended

7    purpose, to bring someone home, to help out a family member,

8    for a legitimate business investment.  The trust was, members

9    of the jury, that the money wasn't going to some fake

10   business account; that it wasn't going to some international

11   bank account in China, that it wasn't being piddled away on a

12   payment for fish.

13        And in this case, members of the jury, the evidence

14   showed you beyond a reasonable doubt that these defendants,

15   they didn't just shatter those hopes, those expectations, and

16   that trust; they broke the law.  So let's talk about the law.

17        The United States bears the burden of proof in this

18   case, and we've embraced that from the beginning.  The

19   Court's going to tell you that in its final instructions.  We

20   have the burden of proving the case beyond a reasonable

21   doubt.  And as the Court will tell you, it's beyond a

22   reasonable doubt, not beyond all doubt, not beyond any doubt,

23   not beyond a shadow of a doubt or a possible doubt.  Beyond a

24   reasonable doubt.  And the Court's going to tell you that a

25   reasonable doubt is one that is rooted in reason and common

1    sense.  Reason and common sense.

2         The Court's also going to tell you about the types

3    of evidence that you can rely on in reaching your verdict.

4    And I anticipate the Court's going to tell you you can rely

5    solely on circumstantial evidence.  So let's take those two

6    concepts together, the burden and circumstantial evidence.

7         Let's say you're sitting in a room.  You can't see

8    outside.  You don't know what the weather is.  The windows

9    are closed.  The doors are closed.  The first person that

10   walks through that door, they're wearing wet rain boots.  The

11   second person that walks through that door, they're wearing a

12   wet raincoat.  The third person that walks through that door,

13   they're holding a wet umbrella.  Now, even though you haven't

14   looked outside, even though you haven't stepped outside, you

15   know beyond a reasonable doubt it's raining outside.

16        Now, is it possible that the person with the

17   umbrella ran it under the faucet before they came in?  Is it

18   possible that the person with the raincoat took a shower with

19   the raincoat on?  Sure.  Anything's possible.  But it's not

20   reasonable.  That's disconnected from reason and common

21   sense.  Reason and common sense.  I submit to you that's the

22   most important tool you have as you deliberate the evidence

23   in this case.

24        And in this case, members of the jury, the

25   government didn't just hand you that wet umbrella, that

1   raincoat, and those rain boots.  No.  We took your hand,

2   walked you to the door, we opened the door and let you touch

3   and feel the rain for yourself.

4        So let's talk about the charges in this case.  As

5   you know, the defendants have been charged with two

6   conspiracies, conspiracy to commit wire fraud and conspiracy

7   to commit money laundering.  As the Court will tell you in

8   its final instructions, a conspiracy, all it is is an

9   unlawful agreement, an agreement to commit a crime.  That's

10  all a conspiracy is.

11       And the Court's going to tell you to prove a

12  conspiracy, the government doesn't need to show you that

13  there was a formal agreement in place or that each person in

14  the conspiracy knew all the details of what was going on or

15  even knew all the people involved in the conspiracy.

16       The Court's also going to tell you that the

17  government doesn't need to actually prove that the underlying

18  crime in this case, wire fraud or money laundering, actually

19  happened.  Also, the government doesn't have to show you that

20  the conspirators participated in the conspiracy more than one

21  time.  One time, that's enough.

22       And here's the specific language from the charge,

23  members of the jury.  And you're going to have this as you

24  deliberate.  Proof of a conspiracy, to show that a defendant

25  conspired to commit wire fraud or money laundering, the

1    government need not prove that he, in fact, committed the

2    object offense of wire fraud or money laundering.

3            Think about what that means here, members of the

4    jury.  The government didn't have to show you that these

5    defendants took even a single dollar; didn't have to show you

6    that the defendants laundered even a single dollar; that they

7    personally enriched themselves, personally profited from this

8    scheme that they were running.  Of course, we did, but we

9    didn't have to show you that.

10           And then look at that second instruction there,

11   aiding and abetting.  The guilt of a defendant in a criminal

12   case may be established without proof that the defendant

13   personally did every act constituting the offense alleged.

14           I want you to keep that instruction in mind,

15   members of the jury, as you evaluate the conduct of Segun

16   Adeoye, who directed people in his clinic to fill out scripts

17   for him; as you evaluate the conduct of the Okeke brothers

18   who directed Lisa Wilson, Isaac Asare, and Peter Omeiri to

19   open bank accounts, deposit cash, and remove money.  Remember

20   that.

21           So really, at the end of the day, the Court's also

22   going to give you a checklist of the elements the government

23   has to show you for a conspiracy.  One, two and three.  Three

24   things.  Was there an agreement to commit wire fraud or money

25   laundering?  Did the defendant know the unlawful purpose of

1    that agreement?  And did the defendant join in that agreement

2    willfully; that is, with the intent to further that unlawful

3    purpose?

4            And I submit to you that the real issue in the case

5    is knowledge and intent, those last two elements.  Knowledge

6    and intent.  Did the defendants really know, understand what

7    they were doing?

8            Because if you think about it, there's been a lot

9    of facts -- a lot of key facts that have gone undisputed

10   through the course of these last two and a half weeks.  Let's

11   start with the obvious.  There's been no dispute that these

12   victims who came in here and told you that they lost hundreds

13   of thousands of dollars, that they were lied to, that the

14   people they were sending money to were fake, weren't real.

15   There's been no dispute about that.

16           There's been no dispute that they actually lost

17   that money or that that money actually went to the

18   defendants' bank accounts.

19           There's been no dispute that these defendants

20   actually transacted in large volumes of cash.  Now, there has

21   been a dispute as to the purpose or meaning of that cash.

22   But the fact that they handled cash, lots of it, that's not

23   in dispute.

24           What hasn't been challenged?  Really, it hasn't

25   been challenged as to the identity or attribution, with few

1    exceptions, of all the calls and text messages and chats that

2    you looked at.  We know, when you see a chat between Chidindu

3    and Alex Okeke, that it's between Chidindu and Alex Okeke

4    because there's been no contest, there's been no objection,

5    there's been no dispute that the people sending those

6    messages, the people sending those calls, they're the people

7    at the table.

8            And then, of course, there's been no dispute that

9    these defendants sent numerous international wires to bank

10   accounts in China, in Japan, in Thailand, in Hong Kong.

11   That's not in dispute.  And along with that, there's been no

12   dispute that there's been conduct that goes from the State of

13   Texas outside the State of Texas.

14           You heard the bank representative say that the

15   servers that process the financial transactions, they're

16   located outside the State of Texas.  So we know there's been

17   an interstate wire transmission in this case.

18           And, finally, members of the jury, we know a proper

19   venue for this case is right here in this courtroom in the

20   Eastern District of Texas.  Why do we know that?  Because a

21   significant part of the conspiracy occurred at that address,

22   706 South Jupiter Road in Allen, Texas.  That address is

23   where Edgal Iribhogbe lived with his wife, Sandra Iribhogbe.

24   That address is where victims sent cash.  That address is

25   where state governments sent ID cards or debit cards for

1    unemployment insurance.  We know that conduct occurred in the

2    Eastern District of Texas, and that's not in dispute.

3            So with all that laid on the table, all of the

4    stuff that's really not in dispute, what is in dispute is

5    what these defendants knew, what they understood, what they

6    intended.  So let's talk about that.

7            Now, we don't have a mind reader.  We can't get

8    inside their heads and figure out what they were thinking

9    two, three, four years ago.  What we have though is

10   compelling evidence, communications, bank statements, audio

11   messages, text messages, and they give us an insight into

12   what they were thinking, what they believed as the criminal

13   conduct was actually happening.

14           So I submit to you the best evidence of knowledge,

15   of intent, is the subsequent action.  The best evidence of a

16   plan is the plan's execution.  The best evidence of a

17   conspiracy is the communications.  So let's look at the

18   communications in this case, members of the jury.

19           The communications, the chats, the texts, the phone

20   calls, the voicemails, you'll have them as you deliberate;

21   they're all over the exhibit list.  And I want to focus first

22   on the communications related to the victims.  Now, think

23   about how this conspiracy, how this scheme, worked.

24           The defendants, the co-conspirators, they had to

25   find, locate, and send proof that they were doing work for

1    the organization.  That proof included messages that were

2    exchanged between the victim and the defendant, or the

3    conspirator, who is soliciting the victim's funds.  That

4    proof included pictures of the mail that was sent with the

5    cash.  That proof included the cash that was actually sent in

6    that mail.  That proof included pictures of wire transfers.

7          And these aren't taken -- what you're seeing on the

8    screen there, Government's Exhibit 36B, these aren't taken

9    from bank statements or search warrants.  No.  These are

10   taken directly from phones, from accounts, online accounts,

11   that are owned, operated, controlled by the defendants.  And

12   you can look.

13         You remember Dwayne Carley, him coming here and

14   testifying.  He was the elderly man in the wheelchair who

15   lost hundreds of thousands of dollars to someone he thought

16   was Charlotte Davis.  We know where he sent some of that

17   money.  You see that wire transfer, Government's Exhibit 36B,

18   page 90, it went straight from Dwayne Carley to Elichi

19   Enterprise, a fake company owned, operated, and controlled by

20   Chidindu Okeke.

21         And then we saw that cash mailing to the Chateau of

22   Allen, 706 South Jupiter Road, Unit 705.  Who lived there?

23   Who purchased that property?  Who was arrested there on

24   September 22nd, 2021?  Edgal Iribhogbe.  Money straight from

25   the victims to the defendants.

1          Again, we have another example.  This is Kim

2    Herbert; she was the first victim who testified.  You've

3    heard her name come up multiple times, multiple times,

4    because we know her money ended up with Edgal Iribhogbe and

5    also Segun Adeoye.  And again, we see the evidence of the

6    communications she's having with her online love interest and

7    how that person is soliciting money from her.  And we see how

8    that evidence is littered all over the co-conspirators, the

9    defendants', devices.

10          Not only that, members of the jury, we're seeing

11   evidence of the wire transfers.  The wire transfers.

12   Remember, she obviously sent money to who she thought was he

13   Ely Pence, and we know that money ended up with Edgal

14   Iribhogbe and Segun Adeoye.  But we also know she sent a

15   hundred thousand dollars wire transfer to Isarko.  Who

16   controlled that Isarko online account?  Chiagozieum Okeke and

17   Chidindu Okeke.

18          Again, another example of a victim's funds, and

19   discussion about those funds, evidence of those funds, found

20   on the defendants' devices.  Look at Edgal Iribhogbe's phone,

21   Government's Exhibit 24B.  This is victim Jane Roe.  And he

22   has evidence of an $80,000 wire transfer that she made in

23   October of 2019.  And then you also see the evidence of the

24   chats, the solicitation chats, with her purported online love

25   interest.

1          Over, and over, and over again, members of the

2    jury, you see the evidence, the proof, the receipts.  But

3    make no mistake.  These defendants actually talked about the

4    fraud they were committing.  They didn't just have receipts

5    from victims.  They actually talked about the schemes they

6    were involved in.  Remember, this was a multi-faceted

7    poly-fraud organization; prescription fraud, unemployment

8    insurance fraud, romance fraud, business email fraud.  You

9    name it, they're in it.

10          So let's talk about the chats, the communications,

11   of Segun Adeoye, and the fraud there.  We know he's sort of

12   an outlier compared to these other defendants.  He was

13   involved in prescription fraud.  He used his prescription pad

14   to go from healer to dealer.  And we see it in the chats that

15   he's having with his assistant, where he's directing his

16   assistant to fill out scripts on his behalf; where his

17   assistant is actually telling him to change dosages for pain

18   medication; where his assistant is actually telling him to

19   change the pharmacy for pain patients.

20          And look at those chats and look at those in

21   context, or side by side, with what you heard, what you saw

22   from the experts in this case, Dr. King and Susannah Herkert.

23   What did they tell you about Segun Adeoye's prescribing

24   practices?  He was running a pill mill.  He was prescribing

25   140 percent more than even than a pain doctor -- and he's a

1    family medicine doctor -- more than an oncologist, more than

2    pain doctors.  They didn't even have to look at patient

3    records to figure that out.

4         And remember, they're comparing Segun Adeoye's data

5    to data of hundreds of others who have submitted PMPs

6    throughout the country.  So they have a reference point for

7    what's kosher, what's appropriate, what's legitimate; and in

8    Dr. Adeoye's case, what's fraudulent.  So we have Dr. Adeoye

9    discussing the fraud with his administrative assistant.

10        We also have the Okeke brothers discussing the

11   fraud amongst each other or between each other.  Now, a lot

12   has been made about those three chats.  There's a reason we

13   brought back the linguist specialist to translate that, so

14   there's no doubt in your mind that what they're talking about

15   there is percentages for dating.  Percentages for dating, 40

16   percent.  That's not a percent for a Naira exchange deal, no.

17   That's a percentage for dating.

18        And we see it in context, members of the jury.  We

19   see it because we see that 40 percent appear in other places;

20   right?  We see it in the chat, Government's Exhibit 31D:  40,

21   40, 20.  Does that look like a Naira exchange deal to you, or

22   does that look like discussion of percentage breakdowns for

23   some sort of scam that these guys are running?

24        And again, we see it.  Chidindu Okeke talking to

25   Peter Omeiri.  "The guy -- if it is dating, yeah, the guy may

agree for 25 and we plead with him.  But if it's wire, the guy will not agree."  Reason and common sense.  What do you think Chidindu Okeke means when he says it is dating, "if it is dating"?  He's talking about romance scam.

And it's not just romance scams, members of the jury, it's also the business email fraud.  We heard from victims of these types of schemes.  We heard from Donald Ortmann.  We heard from Rod Koenen.  Individuals who thought they were investing in something legitimate or facilitating a transaction for something legitimate, but, actually, were just getting robbed blind.

And what does that email -- Government's Exhibit 31C, page 743, what does that email look like to you?  That email is a solicitation email for a business email fraud scheme; $82,000 relating to Washington D.C.  Does that look like a Naira exchange email to you, or does it look like a business email fraud?  Reason and common sense tells you that's business email fraud, members of the jury.

And then, of course, we have all the calls between Edgal Iribhogbe and Sandra Iribhogbe; they talk several minutes about opening bank accounts, shutting bank accounts, moving money.  I pointed out this right here, Government's Exhibit 79B, page 22.  Make no mistake about it.  They say the magic word, "fraud."  The "F" word.  It's clear.  They're talking about fraud, so they know what they're doing.  They

1    intended to join that conspiracy.

2          So let's look at the communications regarding

3    laundering.  Laundering.  What is laundering again?  Now, the

4    Court's going to tell you the government can prove its case

5    on conspiracy to commit money laundering in two ways.  First,

6    it can show you that the defendants conspired to commit money

7    laundering by sending money internationally, outside the

8    United States.  Another way we can show you that they

9    conspired to commit money laundering is by engaging in

10   financial transactions or agreeing to engage in financial

11   transactions that are designed to conceal, hide, disguise the

12   source of their proceeds.  Concealment.  I'm going to take

13   those one at a time.

14          And let's start with laundering related to the

15   international transfers.  International transfers.  So think

16   about it this way.  Did the defendants talk about an account

17   that's going to move the money?  Did the defendants talk

18   about which account internationally is going to receive the

19   money?  It's as simple as that.  Did they talk about an

20   account that's going to move the money?

21          Well, we know that Segun Adeoye, Edgal Iribhogbe,

22   they definitely do.  You saw it.  This May 4th text message

23   from Segun Adeoye to Edgal Iribhogbe, you've seen it multiple

24   times in the trial.  He sends him his account credentials.

25   Segun Adeoye sends his own account credentials to launder

1    money outside the United States.  You see it, Government's

2    Exhibit 25B, page 7866.

3            So they're talking about an account that can move

4    the money.  So did the Okeke brothers.  And this is just one

5    example, one example, members of the jury.  Three accounts

6    listed there in this message.

7            Government's Exhibit 31C, page 1045.  They're

8    talking about accounts that are going to move money

9    internationally.  And here, look carefully, it's not just the

10   account name, the routing number.  But you also have the user

11   name and password for online access.  It's pretty telling,

12   members of the jury.  They don't want to just move money.

13   They want to control those accounts.  They want to own those

14   accounts.  They want to monitor those accounts.

15           And then let's talk about the destination.  Do the

16   defendants talk about where the money is going?  Do they talk

17   about where the money's going?  Of course, they do.  They

18   talk about the source, right, where the monies's coming from,

19   where it's going to leave.  And they talk about the

20   destination, where internationally is the money going to end

21   up.

22           We see this, Edgal Iribhogbe sending Segun Adeoye

23   specific wire transfer instructions to Japan; $43,000 for

24   fish.  For fish.

25           Do the Okeke brothers talk about destination

1    accounts abroad where money is moving?  Of course they do.

2    Look at Government's Exhibit 41C, page 770, reference to

3    Agricultural Bank of China, another recipient bank account

4    overseas that's going to receive dirty money.  They talk

5    about the fraud.  They talk about the laundering.

6        Take a step back.  Look at these chats, especially

7    the chats with the accounts on them.  I mean, who does that?

8    Who sends account credentials by text message?  Who sends

9    wire transfer instructions by text message?  Who sends a

10    notation and a memo line that says "payment for fish"?  I'll

11    tell you who does that.  Fraudsters do that.  Money

12    launderers do that.  But it's not just the content of the

13    communications, members of the jury, it's also how often

14    they're happening.

15        Now, you remember Special Agent Keane Richardson

16    who testified, how he went through the devices and was able

17    to figure out how many times these defendants talked to each

18    other.  We saw that Chidindu Okeke talked to Sandra

19    Iribhogbe, whom I think everyone in this courtroom would

20    agree is a fraudster, is a money launderer -- he talked to

21    her, let's see, over 2800 times in a two-and-a-half-year

22    period of time; 2800 contacts.

23        Of course, you would expect to see several contacts

24    between the brothers, 3400 between Chiagoziem and Chidindu

25    Okeke.  But in a four-month period -- you remember Peter

1    Omeiri, one of the co-conspirators who testified --

2    Chiagozieum Okeke is talking to him at least 58 times.

3            And then, of course, we have the Edgal Iribhogbe

4    and Segun Adeoye contacts, the completed contacts that we

5    went through in painstaking detail.  Taking out the missed

6    calls, taking out the, you know, missed messages, messages

7    that didn't go through, those are completed contacts, 52

8    times in a four-month period.  And remember, members of the

9    jury, they told you on the stand themselves they had hardly

10   talked for the ten years before that.  They had seen each

11   other once, when Segun was driving to Arkansas and dropped

12   off a friend with Edgal Iribhogbe.

13           All of a sudden, they're talking 52 times --

14   messages, calls, texts -- all surrounded by that $43,000 wire

15   transfer to Japan for fish.  You think that's an accident?

16   You think that's coincidence?  Absolutely not.  That's a

17   conspiracy.

18           The content of the communications, the frequency of

19   the communications, and then the timing of the

20   communications, members of the jury.  I want you to look

21   carefully at this slide.

22           Let's go back to May 2020.  May 4th, 2020, Kim

23   Herbert, that romance scam victim who testified, she sends

24   $25,000 to Ely Pence.  And that transaction is being

25   monitored by Sandra Iribhogbe.  We know that because we find

evidence of that transaction on her Google backup.  That same

day, that very same day, Segun Adeoye sends his account

credentials to Edgal Iribhogbe, who then forwards it along to

that same person, Sandra Iribhogbe.  Two days later, Sandra

Iribhogbe tells a co-conspirator that she has Dr. Segun

Adeoye's accounts to move money.

In isolation, members of the jury, each of these

seems pretty bad, they're compelling, probably indicative of

something nefarious going on.  But when you take those

together, when you look at them sequentially, when you

understand and put them in context -- because context

matters -- they tell you a story that these defendants, they

were working together in a large-scale international fraud

and money laundering conspiracy.  The content of the

communications, the frequency of the communications, and the

timing of the communications.

Of course, the money -- that's why we're here --

these victims lost millions of dollars.  And the money in

this case is hardly disputed, members of the jury.  It's

hardly disputed.  Think about it.  The money shows us, it

proves to us, that all those chats, all those communications,

they weren't just in a vacuum; they were for a purpose.  They

show us that that plan that these defendants had, that was

actually executed, was actually carried out.

So let's talk about the money in this case, members

1    of the jury.  And remember, when we talk about the money,

2    that's the black-and-white evidence.  You see, the bank

3    statements, the account statements, the tax returns, they

4    don't lie.  They were the same two years ago as they are

5    today as they will be two years from now.  They don't shift

6    motives.  Their memory doesn't fade.  They're the same.

7    That's powerful for you when you go back to evaluate whether

8    these defendants are guilty.

9         And let's follow the money here, members of the

10   jury.  Follow the money with the taxes.  Now, remember I said

11   earlier the government can prove that the defendants

12   conspired to commit money laundering in two ways.  We talked

13   about the international money laundering, them sending money

14   overseas.  Now let's talk about the concealment of money

15   laundering; concealing, disguising, hiding the source of

16   their proceeds.

17        Well, what better evidence of their concealment

18   than what they're telling the IRS?  You heard from the

19   financial investigator in this case, David Batista.  He just

20   looked at the accounts.  He just crunched the numbers.  He

21   just added up the numbers.  That's all he really did.  And

22   you can see, collectively, these defendants had over $15

23   million running through their accounts in about a

24   three/four-year period.  And collectively, these defendants,

25   they didn't report half of that to the IRS.  That's

1    concealment.

2         Why do you think they're not reporting it to the

3    IRS?  Why do you think they're not telling the IRS or the

4    government about all the money they have coming into their

5    accounts?  Why?  Is it because they just forgot?  Is it

6    because they're just getting extensions?  Is it because

7    they're too busy?  No.  It's because they're committing a

8    crime, they're committing fraud.

9         And another piece of evidence you should consider

10   as to whether there's concealment money laundering happening

11   here, whether the defendants conspired to conceal, is how

12   they used the money in this case.  Think about it.  A lot of

13   cash.  A lot of cash.  Cash mailings, cash withdrawals, cash

14   deposits.  Cash, cash, cash.

15        And you know who looks at cash as the preferred

16   method of payment?  Criminals.  Why is that?  There's a

17   reason for that, members of the jury.  It's because cash

18   doesn't have any identifiers other than the dollar bill,

19   right, other than the face, the denomination.  There's no

20   name on it.  It's anonymous.  Cash doesn't leave a paper

21   trail.  It's easy to split up.  It's easy to move around.

22   It's easy to transport.  That's why these defendants

23   transacted in large amounts of cash.

24        Let's look at examples of cash here.  Let's look at

25   Segun Adeoye.  Remember, guys, he is a doctor.  He's a

1    doctor.  He runs clinics.  He shouldn't be dealing in large

2    amounts of cash.  He shouldn't be dealing in $250,000 of cash

3    in a four-year period.  And how do we know?  How do we know

4    that the cash that he's dealing with is nefarious, is

5    suspicious, is shady?

6         Well, you heard Temitope Adeoye.  You heard her

7    testify.  There was $16,000 of cash that she was transporting

8    for Segun Adeoye -- $16,000 of cash wrapped in a chip bag

9    hidden in a glove compartment of his assistant's car.  Put

10   that in context, members of the jury, with some of the text

11   messages that you're seeing between Segun Adeoye and Temitope

12   Adeoye.  That's not legitimate money.  That's fraud money.

13        And then Edgal Iribhogbe.  Remember he got up on

14   the stand and he said, "Oh, I never received any pictures of

15   cash"?  Well, that was wrong.  He did.  And he actually

16   received it, this one, on a very significant date.

17        Look at Government's Exhibit 36B, page 41.  That's

18   the picture of the cash, the stack of $100 bills that he

19   received.  And look at the date on which he received that

20   picture of cash.  That date's significant, members of the

21   jury, May 14th, 2020.  Because what happens the next day, on

22   May 15th, 2020?  He cuts those three cashier's checks for

23   Segun Adeoye.  That's eventually sent abroad, sent

24   internationally, for some fish payment in Japan.

25        But, of course, the Okeke brothers were involved in

cash withdrawals, deposits, and movement.  Look at it.  This is just a snapshot of one week in 2020, in July of 2020.  In one week, Chidindu Okeke takes out of his business account $10,000, $10,000, $9700, $8,000, $7,000.  Come on, members of the jury.  Who does that?  Reason and common sense.  $50,000 in a week, separated in five separate cash withdrawal transactions?

Maybe the most egregious is Chiagozieum Okeke.  And again, this is a snapshot of a single month's statement, Government's Exhibit 178, page 16.  Look at how much cash he deposits in his account; $281,000.  That's a lot of cash.

So look at the communications, look at the money and you'll see these defendants -- they certainly had the knowledge and the intent to join in this conspiracy and further its unlawful purpose.

And when it comes to knowledge and intent, members of the jury, I want to direct your attention to an instruction that the judge is going to give you, and it's deliberate ignorance.  You may find that the defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  Let that sink in for a second.

And take a step back and think about who these defendants are.  They're well-educated.  We have a doctor, international businessman, a military officer.  We know

1    they're sophisticated enough to open up their own businesses,

2    their own business accounts.  We know they're well-traveled.

3    We know that they have the cultural context to know what

4    4-1-9 is, to know what scamming is, romance fraud.

5          Couple that with all the red flags that would have

6    just popped out to them.  Let's start with one.  The account

7    closures.  You saw that in Government's Exhibit 241.  These

8    defendants had, collectively, I think 50-plus accounts, and

9    the majority of them were closed.  And why do banks close

10   accounts, members of the jury?  When they suspect fraud and

11   money laundering.  That's a red flag.

12         How about the 3,000 contacts that Chidindu had with

13   Sandra Iribhogbe?  Not one of them, not one of them, was a

14   red flag that maybe there's something fraudulent going on

15   here?  How about all the cash that they're moving supposedly

16   for this Naira business?  At no point did they think, boom,

17   maybe this is dirty money, maybe I should look at the source

18   here.

19         How about Segun Adeoye getting -- a doctor, mind

20   you, well-educated doctor, opened up multiple clinics, works

21   in multiple hospitals, traveled the world.  Is it not a red

22   flag for him when he gets three separate cashier's checks

23   from three separate financial institutions cut by the same

24   person on the same day?  Is that not a red flag for him, when

25   that same pattern occurs about a month later?  Red flag,

1    after red flag, after red flag.

2            Make no mistake.  They knew what was going on.

3    They knew what was going on, because a reasonable person,

4    with all those red flags, they would cut it off; they would

5    tell the banks; they'd tell the police.  No, they didn't do

6    any of that.

7            But another piece of evidence when it comes to

8    knowledge and intent, members of the jury, is the lies.  The

9    lies.  Think about it.  Why do people lie?  People lie to

10   cover up the truth, to conceal what's actually happening, to

11   hide something that they don't want exposed.  And in this

12   case, you have numerous lies, big lies, little lies; lies to

13   the victims about why they needed money; lies to the pretrial

14   services officer about employment history, business history;

15   lies to the bank; lies to you, to your face.

16           You see, one lie, two lies, maybe it's an accident,

17   it's an honest mistake.  Three, four lies, maybe it's a weird

18   coincidence, a misunderstanding, something that's forgivable.

19   But when you tell lie, after lie, after lie, when those lies

20   enable you to steal millions of dollars from unwitting

21   victims, when those lies enable you to launder money overseas

22   over, and over, and over again, members of the jury, that's

23   not just a lie, that's not just fraud, we call that something

24   else entirely.  Every person in this room knows what that is.

25   That's a crime.

 1            So you probably notice up to this point we really

 2    haven't talked about the cooperating witnesses, the

 3    testifying co-defendants.  That's for a reason, members of

 4    the jury, because you don't need their testimony to convict

 5    these defendants.  But you know what the Court will tell you

 6    in its final charge.  The Court will tell you that if you

 7    believe those co-defendants, those co-conspirators, beyond a

 8    reasonable doubt, you can rely on their testimony alone to

 9    convict these defendants.

10            But I submit to you that you should treat those

11    individuals just like the investigators would.  Corroborate

12    what they had to say against the evidence and the other

13    information you have.  Corroboration.  So let's walk through

14    some of the cooperating witnesses here.

15            Let's start with Lisa Wilson.  She was a young lady

16    who had the relationship with Chidindu Okeke who worked at

17    Wells Fargo; opened up multiple bank accounts for him;

18    deposited cash at his direction.  And her accounts, we know

19    based on the evidence and based on the testimony, received

20    money from victims, including Donald Ortmann, Alicia Myers

21    and Andrew Graham.  We know that.  And why should we believe

22    her?  How was her testimony corroborated?

23            Well, let's look at the chats.  You saw those

24    chats, Government's Exhibit 36B, page 94, 95, 96.  Those were

25    the chats with Chidindu Okeke.  What does he tell her to do

1   in that first chat?  Do 9800 or 9900, not 10,000.  Why?

2   Because 10,000 flags the bank.

3            THE COURTROOM DEPUTY:  45 minutes.

4            MR. VARADARAJAN:  What else does he do with Lisa

5   Wilson?  How else does he use her?  Well, members of the

6   jury, we saw he takes her bank account information and he

7   passes it along to Sandra Iribhogbe.  For what?  Naira

8   exchange?  No.  He's passing her account information along so

9   that her account will receive fraud money that's then

10  laundered overseas.  It's all part of the conspiracy.

11           Look at it.  He sends her account information.

12  Government's Exhibit 23B, page 34,756.  That's corroboration,

13  members of the jury, of what she told you.

14           So look at Isaac Asare.  He was one of the friends

15  of the Okeke brothers.  He was particularly close to Alex

16  Okeke.  And you remember that he had that business Isarko

17  that Alex Okeke helped him set up the bank accounts.  And he

18  told us that he deposited bulk cash at their direction,

19  sometimes up to $50,000.  He also told us that he gave them

20  his online credentials so they could access the account, so

21  the Okeke brothers could get in and do the wire transfers in

22  the account.

23           Well, let's look at how that's corroborated,

24  members of the jury.  You probably remember one of the

25  victims in this case, Jim Ellett, the military veteran from

1    Virginia who came in.  Let's look at that account for Isaac

2    Asare, Government's Exhibit 159.  We see on November 26,

3    $40,000 wire comes into his account from Jim Ellett, James

4    Ellett.  That same day, that same day, there is a wire

5    transfer using Jim Ellett's funds to Elichi Enterprise.  The

6    company that's owned, controlled, and operated -- the fake

7    company -- by Chidindu Okeke.

8           And why not?  Because it's free money to those

9    defendants.  Chidindu Okeke sends another wire transfer to

10   his personal account, another $9600.  That's corroboration,

11   members of the jury, when we see Isaac Asare telling us about

12   the online credentials and we see the transfers happening on

13   the same day to those defendants, to Chidindu in particular.

14          And then Peter Omeiri.  You guys probably remember

15   him; right?  Isaac Asare, he came before you and he told you

16   he's guilty of conspiring to commit wire fraud.  And the

17   people that he conspired with were Chidindu and Chiagozieum

18   Okeke.  That's what he said.

19          And he talked about, again, opening up a fake

20   business called "Eastern Hardware" at their direction, and

21   how he opened up multiple bank accounts because they told him

22   to.  And like Isaac Asare, how he deposited cash in those

23   accounts.  And like Isaac Asare and like Lisa Wilson, how he

24   gave them online access.

25          Again, you don't just have to corroborate what

1     these individuals say with the evidence and the exhibits.

2     You can corroborate with each other.  Are there consistencies

3     between what Peter Omeiri says, Isaac Asare says, and Lisa

4     Wilson says?  Yeah.  They were all asked to deposit cash.

5     They were all asked to open bank accounts.  They were all

6     asked to provide online access to their bank accounts.  Those

7     are consistencies.  Those are corroboration.

8             And again, we know that Peter Omeiri's corroborated

9     because we have the voicemail on his phone where he says,

10    again -- Chidindu Okeke says, "The guy, if it is dating."

11    "If it is dating."

12            Remember when Peter Omeiri was on the stand?  I

13    think it was the second or third question he was asked:  Are

14    you guilty of this crime?  And he looked to the side, and he

15    looked at you, and reluctantly he said, "Yes, I am."  How do

16    you know?  What were his words?  "It was obvious."  "It was

17    obvious," that's what he said.  And you know what's obvious

18    when you look at that voicemail, when it references "40, 40,

19    20," when it references "it is dating," what's obvious is

20    that the Okeke brothers were pulling the strings here.  The

21    Okeke brothers knew that they were in fraud schemes, business

22    fraud schemes, and certainly in dating online romance

23    schemes.

24            But we had the corroboration with Alex Okeke as

25    well.  You saw these text messages, Government's Exhibit 28B,

1    pages 1725 to 1735.  You saw how Alex Okeke was directing

2    Peter Omeiri; open more accounts, open more accounts, open

3    more accounts.  And just like we're seeing in this scheme,

4    Peter Omeiri is asked to send back receipts, proof,

5    confirmation that cash is being deposited, that accounts are

6    being opened.

7            And I submit to you that something you can use to

8    weigh his credibility is a question that was asked of him by

9    both the government and the defense.  Remember those chats

10   Alex Okeke references having $200,000 to move, then $300,000

11   to move.  Peter Omeiri was asked:  Was that dirty money?  And

12   his response?  "I don't know.  I didn't know about that one.

13   I didn't know that it was fraud money."

14           He had every incentive to just throw them under the

15   bus and say, "Yeah, that was dirty money.  Yeah, that was

16   fraud money."  But he didn't.  He didn't.  He held back.

17   Why?  I think you can use that to assess his credibility, to

18   assess whether he's telling the truth.

19           And then there's Benedicta Atakare.  She was the

20   individual who, again, came forward and said, "I'm guilty of

21   conspiring to commit wire fraud.  The people that I worked

22   with are Sandra Iribhogbe and Edgal Iribhogbe," and we heard

23   how she stole stolen money.  Remember Jane Roe wired $80,000

24   to her business Eagle Global, and she stole that money,

25   withdrew it in cash.  And how Edgal Iribhogbe showed up a few

1    days later, shook her down, took that -- a portion of that

2    cash back home and deposited it.  Well, that's, you know, on

3    its face, kind of a crazy story; right?

4            You steal stolen money.  Someone shows up at your

5    door, takes $50,000 of the 80,000 back.  That's hard to

6    believe.  You just heard that.  Well, we have the proof of

7    that, and the proof of that is in Edgal Iribhogbe's own phone

8    and his own bank accounts.  Government's Exhibit 24B, that's

9    Edgal Iribhogbe's phone.  We see he has evidence, he has the

10   confirmation of that $80,000 wire transfer from Jane Roe.

11           We see from the same time that that money goes into

12   Benedicta Atakare's account, there's a flight that's booked

13   to Maryland, or to D.C., same area.  And we see on Edgal

14   Iribhogbe's phone a voicemail -- a voicemail -- a threatening

15   voicemail directed at Benedicta Atakare.  "We know your

16   compound.  We know your roots."  Benedicta is in Sipele.  "We

17   know everything now.  We have all the information of your

18   compound."

19           You guys remember that voicemail.  That was a

20   threat.  That was a shakedown.  And where was that found?

21   Where was that voicemail found?  It was found on Edgal

22   Iribhogbe's phone.  So he has confirmation of the money

23   coming in.  He has a plane ticket to go to D.C.-Maryland.  He

24   has the voicemail threat.  And you know what else he has?  He

25   has the cash.  Because we see, a few days later --

1    Government's Exhibit 131, page 15 -- all those deposits in a

2    bank account, cash deposits totalling over $50,000.  That's

3    corroboration, members of the jury.

4            And then there's Julio Lugo.  He's not related to

5    the scheme here, but he did share a cell with Segun Adeoye

6    for a few weeks a couple of years ago.  And he said

7    something.  He said that Segun Adeoye confessed to him that

8    he knew the money he was moving -- in that $43,000

9    transaction, that he knew it was dirty money.  And he also

10   described what Segun Adeoye told him about that prescription

11   and fraud -- prescription and patient fraud scheme that he

12   was running.  Now, why should we believe him?  How was his

13   information corroborated?

14           Well, members of the jury, remember his history.

15   Yes, he has a lengthy criminal history.  Yes, he has lied to

16   the government before.  Yes, he's a hardened criminal.  No

17   doubt about it.  But you also remember that he's been an

18   informant before.  He's been a source.  He's been providing

19   information to law enforcement for a while.  And it's not

20   just that he's providing information.  No.  A court has found

21   that he provided substantial assistance, enough so to reduce

22   his sentence on a couple of occasions.  So we have that sort

23   of in the background; right?

24           But then I want to point you to an intimate detail

25   that he shared that was confirmed by both Edgal Iribhogbe and

1    Segun Adeoye.  Remember he came forward and he was talking

2    about the relationship that Segun Adeoye was having with

3    Edgal, the history of that relationship.  And he said, "Yeah,

4    they go way back"; that Segun Adeoye helped Edgal and Sandra

5    when they were having some child-bearing issues, fertility

6    problems.  I submit to you that's a powerful fact.  That's

7    not a fact that's revealed just like that.  That's certainly

8    not a fact that's available in a law enforcement report.

9    That's not a fact that's available for Julio Lugo to find in

10   the indictment.  That's not a fact that he can just go

11   independently research and figure out.  No.  That's a fact

12   that's provided to Julio Lugo in confidence.  And we know

13   that fact is true because both Segun Adeoye and Edgal

14   Iribhogbe came up and said, yeah, that's the truth.

15          So Segun Adeoye wants you to believe that, yeah, he

16   confided and was truthful to -- or, excuse me, that Julio

17   Lugo was truthful and honest when it came to his relationship

18   with Edgal, when it came to the history of his relationship

19   with Sandra, but he's not truthful when it comes to the fraud

20   that was going on, the laundering that was going on.  It's

21   convenient; right?

22          You know what's also convenient?  The month after

23   Julio Lugo talks to law enforcement, Segun Adeoye sues his

24   mother.  Why do you think that happened?

25          (Brief pause.)

1    MR. VARADARAJAN:  Let's talk about the defense

2  presentation, members of the jury.  Now, make no mistake the

3  government has the burden of proof, carries the burden of

4  proof through the entire trial.  The defense didn't have to

5  ask a single question of any witness, didn't have to put on

6  any witnesses; they certainly didn't have to put on the

7  defendants.  The government -- and just because they did,

8  doesn't mean they take on a burden.  The government has the

9  burden, carries the burden.

10    What I will tell you is that their choice to put on

11  evidence means that you can look at that evidence in the same

12  way you look at the government's evidence.  You can

13  scrutinize it.  You can test it.  You can put it through the

14  same stress test that you put the government's evidence.  Ask

15  it questions.  See if it jibes with reason and common sense.

16    So let's look at what each of the defendants really

17  said in their own defense.  Let's start with Edgal Iribhogbe.

18  His defense, "I was out of the country, and it was all

19  Sandra."  Well, members of the jury, I think you can still

20  commit fraud outside the United States.  That's a fact.  And

21  the other fact is Edgal Iribhogbe was in the United States

22  for a lot of the transactions that we talked about in this

23  presentation.  Let's leave that aside, though.

24    Let's leave aside the fact that Edgal Iribhogbe's

25  accounts received money directly from victims in this case,

 1    like Shirley Martin, Colleen Heckman, Kelly Helmick.  Let's

 2    leave aside that Edgal Iribhogbe owned that 706 South Jupiter

 3    Road address that received money from unemployment insurance

 4    claims.

 5              THE COURTROOM DEPUTY:  One hour.

 6              MR. VARADARAJAN:  Let's leave aside that he had

 7    extended phone calls with his wife, Sandra Iribhogbe,

 8    discussing fraud, and laundering, opening up accounts.  Let's

 9    leave all that aside for a second and just ask a simple

10    question.  Why didn't he stop it?  Why didn't he cut off the

11    financial ties with Sandra who apparently was super

12    manipulative?  Super sneaky, I think that was his word.  Why

13    didn't he just cut it off?  Sure, I understand.  We can all

14    understand why you may not want to go to the police.  But why

15    not cut off the financial ties?

16              I'll tell you why.  It's because she was his

17    partner in crime.  He needed her just like she needed him, to

18    get the money, to move the money.  They worked together.  He

19    was in on the fraud.  That's why he couldn't cut off the

20    financial ties, members of the jury.

21              Let's look at Dr. Adeoye.  Now, his defense really

22    boils down, as far as we can see, to two things.  Well, the

23    data about the prescription fraud, that it's just wrong.

24    It's out of context.  It's mischaracterizing what happened.

25    And the other piece of that as well is "I was just doing a

1    favor for a friend."

2           Let's start with the prescription fraud part of it,

3    members of the jury.  Reason and common sense tells you

4    legitimate clinics don't operate in cash.  Reason and common

5    sense tells you that family medicine doctors shouldn't be

6    prescribing controlled substances at a rate 140 percent

7    greater than what a pain doctor would be doing.  Reason and

8    common sense tells that you a legitimate practicing physician

9    wouldn't be directing his staff to fill out prescriptions for

10   him.  Reason and common sense tells you that a legitimate

11   practicing physician who is not committing fraud wouldn't be

12   allowing his staff to tell him to change pharmacies, wouldn't

13   be allowing his staff to tell him to change the dosage for

14   pain medication.

15          So let's look at the "I was doing a favor for a

16   friend," the friend being Edgal Iribhogbe.  You remember

17   Segun Adeoye telling you that; "I was doing a favor for him."

18   Well, let's be clear.  They hadn't talked very much for the

19   ten, twelve years before that.  They had seen each other

20   once.  A favor for a friend, members of the jury, is like

21   giving them a ride to the airport.  A favor for a friend,

22   watching their dog while they're out of town.  A favor for a

23   friend, even loaning them money.

24          A favor for a friend, reason and common sense tells

25   you, is not loaning them your account credentials so they can

1    deposit money and then moving that money to some bank account

2    in Japan for fish.  That's not a favor for a friend, members

3    of the jury.  That's fraud and laundering.

4         And I want to take you back to his testimony,

5    focusing you on something he said.  Do you remember he was

6    talking about doing the research on that fish company in

7    Japan, saying, "Yeah, I looked into it.  It was legitimate.

8    They had a website.  Nigeria imports a lot of fish."

9         What he didn't say was that he looked into the

10   source of the money coming into his account.  He didn't say,

11   "Oh, yeah, I vetted that money that was coming into my

12   account to make sure it wasn't dirty money.  I looked at that

13   to make sure it wasn't romance scam money, it wasn't business

14   e-mail money.  I made sure of that."

15        He didn't even say he asked Edgal exactly where

16   that money came from.  And, again, members of the jury,

17   remember who we're dealing with.  We're dealing with a

18   doctor, well-educated doctor, who clearly has the context to

19   know what 4-1-9 is, how these fraud schemes work.

20        And do you know why he didn't tell you that he

21   looked into the source of that money?  Do you know why?

22   Because he knew it was dirty.

23        And then the Okeke brothers, they've really leaned

24   into this, "it was just a Naira exchange business we were

25   operating."  That's their defense.  They were in the

1    Naira-exchange business lane, and they didn't drift over into

2    the fraud lane, and they didn't drift over into the money

3    laundering lane.  They just stayed in that Naira-exchange

4    business lane.

5         Well, members of the jury, if that's true, why did

6    their accounts receive money from victims?  If that's true,

7    why did they have other individuals, who've pled guilty to

8    conspiring to commit wire fraud, why did they have those

9    people move cash through accounts for them?  If they're in

10   this Naira exchange business, why are they sending money to

11   China, and Japan, and Hong Kong?

12        Now, don't get me wrong.  The evidence supports

13   that they were doing some sort of exchange, some sort of

14   Nigerian currency exchange; that's what the ledger shows.

15   But just because you're doing one illegal activity, doesn't

16   mean that you can't be doing another illegal activity,

17   members of the jury.

18        So I submit to you the evidence shows you that the

19   Okeke brothers, yeah, they were committing a crime in running

20   this illegal Naira exchange business, but you know what else,

21   what other crime they were committing?  They were conspiring

22   to commit wire fraud and they were conspiring to commit money

23   laundering.  And the most powerful evidence, members of the

24   jury, is the lies that they told you on the stand.  My

25   co-counsel, Ms. Rattan, she's going to come before you and

1    she's going to break down those lies and show you how some of

2    the statements they made were demonstrably false.

3              But I'll leave you with this regarding the defense.

4    Their defense boils down to two words.  "Trust me."  "Trust

5    me," the defendant.  Don't trust the evidence.  Don't trust

6    the bank statements.  Don't trust the FBI.  Don't trust the

7    IRS.  Don't trust the witnesses, the victims.  Don't trust

8    the cooperators.  Don't trust your reason and common sense.

9    Members of the jury, that's not a defense.  That's

10   desperation.

11             Now, you probably have had this thought over the

12   past few weeks -- it's been almost, what, three weeks now --

13   probably wondering why are we here.  There is a lot of

14   evidence.  Why didn't these guys plead guilty?  Well, members

15   of the jury, every defendant has a right, a constitutional

16   right, to have a trial.  Just because they choose to exercise

17   that right, it doesn't mean that the case against them is

18   weak.  It doesn't mean that the government can't or hasn't

19   met its burden.  All it means is that our system is working.

20   The defendants chose to have a trial.  They're putting the

21   government's evidence to its test.  And the government's

22   meeting its burden of proving to you beyond a reasonable

23   doubt that they're guilty.  That's all it means.

24             And I submit to you that this case, it's not that

25   hard, because when you get back in the deliberation room, the

 1    evidence is going to start to stack up.  You're going to see

 2    the chat messages, and you're going to see and think about

 3    what the co-conspirators said.  You're going to hear the

 4    audio recordings, look at those bank statements, those

 5    charts.  You're going to think about what the victims told

 6    you.  You're going to see and remember all the cash that

 7    these defendants moved.  And then you realize they're boxed

 8    in.

 9            That moment when you realize the defendants are

10    boxed in, that there's nowhere for them to go, that there's

11    no other reasonable explanation for what's going on, that

12    moment, members of the jury, that's proof beyond a reasonable

13    doubt.

14            So I'll leave you with this.  We're either here

15    because this is all a weird coincidence -- all this evidence

16    that's been collected, it's all just a weird coincidence --

17    or that evidence is evidence of a conspiracy.  So ask

18    yourselves that simple question:  Coincidence or a

19    conspiracy?

20            Coincidence or a conspiracy?  The day that Kim

21    Herbert sends that second wire transfer, that same day, Segun

22    Adeoye sends his account credentials to Sandra Iribhogbe.

23            Coincidence or a conspiracy?  Each of these

24    defendants transacted in volumes and volumes of cash.

25            Coincidence or a conspiracy?  Chidindu Okeke's fake

1    company, Elichi Enterprises, wrote checks to another fake

2    company, Peter Omeiri's Eastern Hardware, and another fake

3    company, Chiagozieum Okeke's company, Marelilex Enterprises.

4            Coincidence or a conspiracy that the discussion of

5    the $80,000 that was sent previously to Edgal and Segun, that

6    $80,000 ties back to Solomon Esekheigbe who, you'll recall,

7    Segun Adeoye told you was a childhood friend and who also

8    happens to be a co-defendant and co-conspirator in this case.

9            Coincidence or a conspiracy?  Edgal Iribhogbe cuts

10   three checks from three different financial institutions on

11   the same day for the same person, and then he does the same

12   thing about a month later.  Coincidence or a conspiracy?

13           Coincidence or a conspiracy?  You hear the phrase

14   "dating" and you see the numbers, "40, 40, 20," multiple

15   times in communications with Chidindu Okeke and Alex Okeke.

16           Coincidence or a conspiracy?  Members of the jury,

17   I'm going to slow down here.  Take a look at this slide.  You

18   see the reference to 20,000?  Government's Exhibit 31C, page

19   740?  This is a chat between Chidindu and Alex Okeke; 20,000,

20   and a picture is attached there.  It's a 20,000 wire transfer

21   from Donald Ortmann, the same Donald Ortmann who came before

22   you and testified that he lost hundreds of thousands of

23   dollars to a business e-mail scheme.

24           Make no mistake.  That chat where they're talking

25   about $82,000 to Washington, D.C., that's fraud, and here's

1    the black and white evidence of it.  Coincidence or a

2    conspiracy?

3              Coincidence or a conspiracy?  Collectively, these

4    defendants had over 50 accounts; had over 20 accounts shut

5    down; ran more than $15 million through those accounts, and

6    reported half of that -- less than half of that to the IRS.

7              Coincidence or a conspiracy?  We know that Segun

8    Adeoye and Edgal Iribhogbe had a 30-minute call around the

9    time that this $43,000 transfer was happening.  And look at

10   Government's Exhibit 25B, page 405; 30-minute call.  Look at

11   the time stamp there.  During that call, members of the

12   jury -- coincidence or a conspiracy -- that Segun Adeoye is

13   sending pictures of the wire transfer to that fish company in

14   Japan.

15             Coincidence or a conspiracy?  Edgal Iribhogbe lands

16   in the United States on May 1st, 2018.  Two days later, he

17   opens a bank account at Legacy Texas Bank.  Five days later,

18   Shirley Martin wires in $60,000 to that bank account.  That

19   same day, he transfer out $53,000 to Asia.  Do you think

20   that's a coincidence or do you think that's evidence of a

21   conspiracy?

22             Coincidence or a conspiracy, members of the jury?

23   Now, these defendants, they're sending money to common

24   locations, common locations overseas, common international

25   bank accounts.

```
 1              Coincidence or a conspiracy?  The money that

 2     they're sending overseas is sourced from common victims,

 3     victims that testified in this case.

 4              I submit to you that the answer, each and every

 5     time, is conspiracy.  So on behalf of the United States, I

 6     ask that you do what the facts compel, what the law requires,

 7     what justice demands, find these defendants guilty as

 8     charged.  Thank you.

 9              THE COURT:  Thank you.

10              Mr. Linder, if you would like to make your closing

11     argument.

12              MR. LINDER:  May I begin, Your Honor?

13              THE COURT:  Yes.

14              MR. LINDER:  Ladies and gentlemen, you're on the

15     homestretch, the ninth inning.  Thank you for being here the

16     last two and a half weeks.  This process wouldn't work

17     without you.  We told you that in voir dire.  And here, in a

18     couple hours, the case is going to be in your hands, and

19     we're going to ask you to look at all this evidence and

20     evaluate it on behalf of each of our clients respectively.

21              Now, the government's presentation is slick, it

22     looks nice.  They've got a great PowerPoint, great

23     presentation, or great boards, and those things.  But as the

24     Judge will tell you in the charge when he reads it, and as

25     the law suggests, summary exhibits are not evidence.  Summary
```

1    exhibits are just their way of trying to present you the

2    evidence.  You need to look at the evidence itself in this

3    case.  You can look at some of it, if you want, but they are

4    not evidence.  So look at the testimony that was presented.

5    Look at the answers we got to cross-examination.  Look at

6    what our clients said.

7            And I'm going to address you specifically on behalf

8    of Edgal.  Now, in regards to my client, you heard about his

9    upbringing, a very good upbringing.  His parents worked for

10    the state department.  He was raised overseas in India, in

11    Nigeria.  He's college educated, has a degree.  Started

12    working in the international oil and gas business in 1995;

13    30-plus years in the oil and gas industry.  And you heard him

14    talk about his investment portfolio, his real estate, and

15    things like that.

16            Why is that important?  Why is that important?  He

17    has no motive.  He has no motive to commit these fraud scams.

18    The government hasn't come in here and offered any kind of

19    evidence saying that he does not have the portfolio he does.

20    They could have if they had chosen to, but they didn't

21    because it's true.

22            Thirty years in the industry; you heard him talk

23    about it on the stand.  You heard him talk about all the jobs

24    he's had, the kind of work he's done, where he's traveled.

25    In fact, you heard about the real estate portfolio he has in

1    the States, and here, where Sandra settled down ten-plus

2    years ago, wherever, in Allen.  And he's got -- his sister's

3    got a house in Houston where he spends a lot of time.

4            What's important to know is because of all this, he

5    has no reason to be involved in this fraud or this scam with

6    Sandra.  He has his own money.  He has his own investments.

7    And what's interesting about his real estate investments in

8    Allen, what you heard, he owns five different town homes in

9    Allen in the same apartment complex -- same town home

10   complex, Chateau whatever, in Allen; five different ones.

11   Where did the government say all the fraud was linked?  One

12   unit.  And who lived in that unit?  Sandra.  Sandra was the

13   connection to this fraud scheme.

14           He has other units, including where his sister

15   lives in Houston.  Why isn't there any fraud tracked there?

16   If Edgal's a fraudster and he's trying to manipulate the

17   government and do different things, he would use different

18   addresses.  You heard the FBI and multiple agents came in and

19   said fraudsters use different names, identifying information,

20   different addresses, to conceal their activity.  What they

21   also told you is Edgal always used his name, his identifying

22   information, and he had two addresses, Allen and Houston; and

23   his address was not Sandra's apartment.  You need to look at

24   that.  That's important.  Sandra is the common nexus through

25   all this.  My client had no motive.

1    Now, in ten or twelve days of testimony, the

2    government has brought you tons of exhibits, tons of witness

3    testimony.  And so I'm not going to go back through all that,

4    but I'm going to -- I want you to focus on eight or ten

5    things, and I'm going to go through them with you, that you

6    should focus on in regards to my client.

7    Exhibit 271, that's my client's travel schedule

8    that the government introduced; you'll have it back there.

9    Pages 2 and 3 document all the times he was in and out of the

10    country from 2017 to 2020, almost four years' worth of

11    travel.  I'm going to list this out for you right now, but

12    you can verify it if you need to.

13    In 2017, Edgal was only in the United States for

14    three to four weeks.  He spent eleven -- over eleven months

15    overseas, working.

16    In 2018, my client was only in the United States

17    for two and a half weeks.  He didn't even come into the

18    country until May of 2018, and spent a week in May and I

19    think a week in July, and he was gone again.  2018, he was

20    only here for two and a half weeks.

21    In 2019, my client was here for two weeks in

22    January, one week in June, one week in August, one week in

23    October, and one week in November.  He spent about five weeks

24    here in all of 2019.

25    In 2020, my client was only here for one week in

1    January, and then he didn't come back until COVID shut

2    everything down in March of 2020. But by August when travel

3    restrictions were getting eased, he was back out of the

4    country for most of the rest of 2020.

5            Now, as the prosecutor has said, you can commit

6    fraud when you're overseas. Yes, you can. But a lot of this

7    fraud, if you'll remember, showed tons of ATM deposits and

8    ATM withdrawals and bank activity, some of it in his account,

9    and a lot of it during times he's not in the country. Yes.

10   Can you do a wire, if you're overseas, to your bank account?

11   You can. But if you'll notice on some of the wires, even if

12   he was out of the country on the wire -- out of the country

13   during a wire, the activities with his bank, the physical

14   withdrawals, the deposit of cash, all those things were going

15   on when he was out of the country; things he couldn't do.

16           You heard a witness from the bank come in and they

17   testified about all the pictures, 146 different pictures, of

18   people doing activity in Edgal's account over a period of

19   time. None of them were Edgal. A lot of them were Sandra,

20   her nephew, Damilola, which you heard a lot about. None were

21   Edgal. I want you to think about that.

22           Now, timing is important, and it gets into that

23   because if his activities -- if his accounts are being used

24   when he's out of the country, well, someone else has got

25   access to those accounts. What did the agents tell you?

1    What did my client tell you?  The agents verified it

2    themselves that Sandra had access to Edgal's accounts.

3           And what did one of the co-defendants tell you

4    about the Okekes?  Well, somebody else had access to some of

5    their accounts, and their accounts were being used

6    fraudulently without their knowledge.  I mean, it was common

7    in this thing that people were using other people's accounts,

8    and my client's account was being used by Sandra.

9           And looking at that, the times the government talks

10   about there being wires in, like Shirley Martin wires into my

11   client's account, things like that, there's also

12   corresponding wires into Sandra's account, corresponding wire

13   withdrawals.  Why?  She's running this scam.  She is running

14   this activity.  Remember, Government's Exhibit 36C, page 31

15   is a text from Sandra giving Damilola the account information

16   of my client.  One of the government's exhibits.

17          There's another government's exhibit which Sandra's

18   bragging that she has a doctor to help her move money.

19   Remember Benedicta Atakare said Sandra's the one that taught

20   her to do scams.  Remember the agents talked about

21   identifying someone in Nigeria; isn't this a fraud scam?  And

22   they linked it to Musa and Sandra here in the United States,

23   not my client.  Remember when the government told you they

24   got a wiretap on Sandra's phone and they couldn't get one on

25   Edgal's phone.

1          MS. RATTAN:  I object.  That's mischaracterization

2     of the evidence.

3          THE COURT:  Overruled.

4          MR. LINDER:  They did not get a wiretap on Edgal's

5     phone.  That should tell you a lot, ladies and gentlemen, of

6     who's behind this fraud.

7          You saw a lot of Cellebrite records from my

8     client's phone, from everybody else's phones.  And what did

9     you see?  Other than my client having some conversation, what

10    did you see on my client's phone?  Other than my client

11    having some conversation with his childhood friend and things

12    like that, and there maybe being pictures of wires on my

13    client's phone, there's not a single communication with the

14    fraud victims on my client's phone.  He's not communicating

15    with any of these people.  He's not running any of these

16    fraud scams.  There's plenty on Sandra's phone, we saw that,

17    but there's not on my client's phone.

18         Agent told you there's no pictures of cash on my

19    client's phone; there's plenty on Sandra's phone.

20         MS. RATTAN:  I object.  That is a

21    mischaracterization.  There is pictures on his phone.

22         THE COURT:  Overruled.

23         MR. LINDER:  Exhibit 79B was a transcript of one of

24    those phone calls we heard that the government put in early

25    on, and it's a transcript of Edgal scolding Sandra for using

1    the accounts.  And they say he used the word "fraud" in

2    there.  But if you look at the transcript, he uses "fraud" in

3    a question.  "They say the bank says there's been fraud," not

4    "I've committed fraud" or "We're doing a fraud."  It's more

5    of a question about "I'm finding out that there is fraud."

6    That was in the government's transcript, 79B.

7            Now, I want to read to you -- and it's important --

8    timing is important, as I mentioned earlier.  That

9    conversation occurred in September of 2020.  Remember,

10   Edgal's been out of the country for most of '17, '18, '19,

11   and early 2020.  He gets into the country in 2020, and he

12   starts to realize late in that year what's going on with

13   Sandra.  And that's why the timing is important with all

14   this.  That phone call happened in September of 2020 where

15   he's scolding her for this fraud.

16           What else happened in the Fall of 2020?  We put

17   these in our case, and I'm going to read them to you.  These

18   are text messages taken from -- I don't remember if they're

19   Edgal's phone or Sandra's phone, but text messages that Edgal

20   was texting Sandra, and there's about a half a dozen of them.

21           "Stop putting funds into my account with or without

22   my knowledge.  You know the banks have sent me messages for

23   fraudulent funds."  This is Edgal telling Sandra, Stop.  Stop

24   putting money in my account.

25           Next, "When you stop, we will not have any issues

1    ever again."  That was in September of 2020.  That was,

2    sorry, October of 2020.

3          The next month, in November, "I have warned you

4    several times stay out of these fraudulent activities but you

5    choose to continue because you claim you don't have docs to

6    work."  This is Edgal telling his wife.  We've had the

7    conversation.  We've had now the text in October.  This is

8    November.

9          "I am not part of your dubious activities."  This

10   is November.  "Count me out and stop using my house for

11   tenants for addresses with your cohorts."  And it's not just

12   one message, it's about a half a dozen of them over about a

13   six-week period.

14         "Why are you using your child to lie?  You need to

15   stop all these lies and stop using people to achieve your

16   gains."  This is all in the Fall of 2020.  And that's

17   important because this is when he finds out what she's up to

18   and he tries to distance himself from her.

19         And, yes, as the prosecutor said earlier, there may

20   be reasons not to cut off ties.  What do you know about Edgal

21   and Sandra?  They have three children together, okay.  So

22   maybe -- and she lives in a condo that he owns or a town home

23   that he owns.  So there are some personal issues there.

24         But you see him there September, in October, and

25   November telling her stop.  Stop your fraud.  Leave me out.

1    Leave me alone.  Stop using my accounts.  Why?  It's because

2    he's not part of it.  He's got his own money.  He's got his

3    own job.  He's got his own investments.  He doesn't need her

4    fraud.

5         Sandra is the nexus to any of the fraud activity

6    linked to my client, Edgal Iribhogbe.  Where is she?  Where

7    is Sandra?  You heard she pled guilty.  You heard Damilola

8    pled guilty, her nephew.  You heard the agents testify that

9    those are the two they saw destroying documents out of 706

10   South Jupiter, Unit 705, Sandra and Damilola.  Yes, they said

11   my client had been seen there a couple of times, but he's got

12   three kids living there.  So, of course, he's going to be

13   seen there.  But it was her and her nephew that destroyed

14   documents or tried to destroy documents.  It was her nephew

15   that she gave Edgal's account information to.

16        Sandra and Damilola, right smack dab at the top of

17   this thing, and they both pled guilty and they didn't come in

18   here and testify.  It's a reasonable deduction from the

19   evidence they didn't come testify --

20        MS. RATTAN:  I object.  It assumes facts in

21   evidence.  Improper.

22        THE COURT:  Sustained.

23        THE COURTROOM DEPUTY:  You have 15 minutes.

24        MR. LINDER:  Thank you.

25        Let's talk about Benedicta Atakare.  She came to

1    testify.  She signed a plea agreement, also.  In fact, three

2    co-defendants came in to testify, and they signed similar

3    plea agreements that all say -- they have the same thing in

4    here -- even though I'm pleading guilty, I do not agree with

5    the government's theory of the case, basically.  I do not

6    agree --

7          MS. RATTAN:  Object.  That's a mischaracterization.

8    It's been left to the Court to assess sentencing.

9          THE COURT:  I understand.  He's just reading from

10   the document, so overruled.

11         MR. LINDER:  Yes, sir.

12         THE COURT:  Go ahead.

13         MR. LINDER:  The defendant does not agree but

14   understands the government will argue the scheme involved

15   moving funds to foreign jurisdictions.

16         Why didn't they agree?  They didn't know.  They may

17   not have known.  And they have multiple disagreements with

18   the government in their plea agreements; okay?

19         Maybe Sandra and Damilola have the same plea

20   agreement.  I don't know.  But they didn't come to testify,

21   even though they're at the top of this pyramid, and they

22   could have given you valuable information.

23         The government has the burden of proving this case,

24   and there are witnesses they could have brought you that they

25   didn't.  The witnesses they brought you told you they

1   disagreed with certain theories of the government's case.

2   That is important.  That is important for you to know when

3   you go back there and consider the evidence.  Some of their

4   own witnesses disagree with their theory of the case.

5           MS. RATTAN:  It's misleading.  It's a disagreement

6   over the loss amount, the number of victims, the age of the

7   victims.  It's misleading.

8           THE COURT:  Well, I understand there is a

9   difference there.  But go ahead.

10          MR. LINDER:  Thank you, Your Honor.

11          There were twelve different victims alleged in this

12  scheme, nine that testified, and three that we did the

13  stipulations on.  And of those twelve, there's not a single

14  communication in Edgal's phone with any of those victims or

15  engaging in some kind of fraud scam with any of those

16  victims.  There's plenty on Sandra's phone.  There's none on

17  Edgal's phone.

18          Yeah, there's some pictures of some wires.  There

19  are some pictures of some money I think that Sandra sent.

20  But there's no communications from any of the twelve victims;

21  no evidence that he communicated with any of them; that he

22  ran any kind of scam with any of them or against any of them.

23  That's important to know.

24          IRS agent came in and testified he was unable to

25  verify my client's overseas accounts or his investment

1    portfolio, or unable to testify about it.  And if they had

2    wanted to, they could have verified all that.

3         MS. RATTAN:  I object.  That's improper.  It's

4    speculation.  It's not accurate.

5         THE COURT:  Sustained.

6         MR. LINDER:  I believe it was Detective Jason

7    Hollingshead from the task force who did the raid on Sandra's

8    apartment, and they recovered a lot of the documents -- no,

9    he's the one that did the trash and recovered all the things

10   from the trash; all the cards, and all the cash receipts, and

11   all of that.  He's the one that identified that it was Sandra

12   and Damilola that tried to destroy all that evidence.

13        Agent Luke Angert from the Department of Labor, he

14   came in and discussed the three people we did the

15   stipulations on that had unemployment scams run against them.

16   A lot of that stuff was on Sandra's Google Drive backup that

17   we saw; there were messages between Damilola and her talking

18   about this scam and forwarding, you know, this scam.

19        There were zero of those messages that included

20   Edgal in the text stream.  None.  It was Sandra and Damilola.

21   The stuff got mailed to that apartment, Unit 705.  That's the

22   apartment she lived in.  If Edgal was a fraudster, how come

23   he didn't move them around to different apartments and

24   different things like that?  But he's not a fraudster.  It

25   was Sandra, and she was using her own apartment.

1          I would like to talk about the charge just briefly.

2    Well, before I go to that, David Batista, the senior

3    financial investigator from the Department of Justice, came

4    in and talked about fraud and money laundering.  And

5    Ms. Rattan, I believe it was with this witness, said, "Okay.

6    The act is important, you know, in what they're doing."

7          "Yes, it is."

8          And on cross-examination I asked him "But don't you

9    have to have criminal intent also before there's a fraud?"

10         And he said "Yes."

11         The act of wiring the money itself is not illegal,

12   or out of country -- in the country or out of the country,

13   it's not illegal.  The act of depositing cash is not illegal.

14   What makes it illegal is knowledge of the fraud, the

15   ill-gotten gains, having knowledge of the scam.

16         And there were several hypotheticals I asked about

17   what if a paralegal, or your spouse, or a relative moved some

18   money or got some money illegally and moved it to your

19   account?  Well, if you didn't have knowledge or reason to

20   know, you haven't done anything illegal; it's the other

21   person that's perpetrating a fraud.  And that's important

22   when you look at Sandra's relationship with Edgal and the

23   knowledge he had about his accounts.

24         One other witness that fits into that mode was Lisa

25   Wilson.  The government brought you Lisa.  I feel bad for

1    her.  But she worked for a bank.  She got involved in this by

2    depositing money and wiring money out.  Why wasn't she

3    indicted?  You know why?  She didn't have knowledge of the

4    fraud.

5              MS. RATTAN:  I object.  It calls for speculation.

6              THE COURT:  Sustained.

7              MR. LINDER:  She didn't get indicted.  So ask

8    yourselves that.

9              I'll tell you my client's in the same position.  He

10   was a busy man.  He was traveling all over the world.  He's

11   got lot of accounts.  He's got work -- he does a lot of work.

12   And he foolishly allowed Sandra -- because she was managing

13   his properties and whatever else, he foolishly allowed Sandra

14   to use his accounts.  That's what my client is a victim of.

15   He's a victim of trusting his ex-wife.  She's the mother of

16   his children.  And she perpetrated a fraud through his

17   accounts.

18             Now, on the charge, just a few things I want to

19   address with you.  You'll have this to read.  The Judge is

20   going to read it to you, and I'm sure he'll give you a copy.

21   Multiple defendants and multiple counts.  What that means is

22   you have to look at the evidence for each defendant

23   independently.

24             If you believe one of them is guilty, you can't

25   impart that on somebody else.  You've got to look at the

1   evidence against Edgal on behalf of Edgal.  You can't use any

2   evidence there against anybody else.  Likewise, you can't use

3   evidence against anybody else against Edgal.  You have to

4   look at each defendant individually and as to the two counts

5   individually.  You can find all guilty, all not guilty, one

6   guilty, three -- whatever combination you find, but each one

7   of them is independent.

8          There is an instruction in there that I told you at

9   the beginning of my closing, summary exhibits are not

10  evidence.  The government's got a great presentation.

11  They've got the ability to do that.  Those summary exhibits

12  are great for summarizing things; they're not evidence.  The

13  evidence came from the witness stand.

14         And when you get into the two underlying counts,

15  the fraud and the money laundering, both require knowledge of

16  the ill-gotten gains.  Just receiving money in your account

17  as a favor, wiring it to somebody to help somebody out, is

18  not fraud, it's not money laundering.

19         Now, if you knew the source of the money was

20  fraudulent, that's a different story; my client didn't.  A

21  lot of what my client was doing was a favor to Sandra.  He

22  allowed her to have access to his accounts.  A lot of those

23  wires in are accompanied by cash withdrawals and ATM

24  activity, most of that when my client wasn't in the country.

25  Yeah, you can do a wire in.  But they're with those cash

```
 1    transactions.  So you've got to have knowledge of the
 2    fraudulent money for there to be fraud and money laundering.
 3                 MS. RATTAN:  I object.  That's a misstatement of
 4    the law.  The charge in each count is conspiracy.
 5                 THE COURT:  Sustained.  And, of course, the Court
 6    will give you the instructions on the law.
 7                 MR. LINDER:  Thank you.
 8                 Ladies and gentlemen, knowledge is required.  And I
 9    believe when you look at the evidence, it's unfortunate my
10    client's in this situation.  The government doesn't have to
11    prove motive, but motive is something you can think about.
12    My client had no motive.
13                 Sandra is a single mom, mother of three, no job.
14    My client's got a great job, or he did have a great job.
15    He's got no motive to be involved in this.  But Sandra has
16    every reason to be involved in this.  She's trying to support
17    herself and her kids.
18                 And the agents told you that when they first got
19    onto this case, Sandra was the connection in Texas, not
20    Edgal.  Sandra is the one they got a wiretap for, not Edgal.
21    Sandra is the one they started surveilling her at her town
22    home.  Edgal happened to show up a few times.  It was her.
23    Edgal wasn't on their radar until they saw him at some point,
24    or saw a wire go through his account.  He wasn't a part of
25    this.
```

```
1              Ladies and gentlemen, I'm going to ask you to look

2    at the evidence on behalf of my client, and I'm going to ask

3    you to find him not guilty, and the reason is he didn't have

4    knowledge of what was going on.  He didn't use his -- he

5    allowed his wife to use his -- ex-wife to use his accounts as

6    he shouldn't have.  But I think if you look at all the

7    evidence -- and that's why I say you need to focus on the

8    travel documents and all the other things you've seen that

9    are coincidental, and the timing of the text messages he sent

10   her, the voicemail, the conversation that they intercepted on

11   the wire.  He realizes by about September of 2020, she's

12   using my accounts.

13              THE COURTROOM DEPUTY:  Five minutes.

14              MR. LINDER:  The bank has told me there's fraud.

15              Thank you.

16              "I'm worrying about fraud.  Sandra, stop."

17   Accompanied by six or seven text messages over the next six

18   weeks.  Does that sound like someone who wants to continue

19   engaging in fraud?  No.  It sounds like someone who has found

20   out someone's using him and telling them to stop.  So that's

21   what my client did.

22              Thank you for your time, ladies and gentlemen.  I'm

23   going to ask you to find my client not guilty.

24              THE COURT:  Thank you.  We're going to do one more

25   defendant before we'll take a break then.
```

1          Mr. Smith?

2          MR. SMITH:  Yes, Your Honor.  May I have just a

3    second to get set up, please, sir?

4          THE COURT:  Yes.

5          So ladies and gentlemen, we'll take a break after

6    the next defendant's closing argument, and we'll come back.

7    So...

8          MR. SMITH:  Good afternoon, ladies and gentlemen.

9    Trials are about betrayals.  Trials are about betrayals.  For

10   each one of those victims in this case, they were betrayed.

11   They were betrayed, and my heart goes out to them.  We can

12   identify with that betrayal because each one in our lives

13   were betrayed.  Ladies and gentlemen, in this case, Dr. Segun

14   Adeoye has also been betrayed.  We're going to talk about

15   that.

16         But before we get there, I want to talk to you

17   about the jury charge.  This is the Court's instruction.

18   This is the Court's law.  This is the law that you're going

19   to follow when you get back in the jury room.  When you have

20   questions, this is your roadmap.  When you have questions

21   during that deliberations, go to the charge because the

22   answers are there for your guidance.

23         We've heard a lot about conspiracy.  Conspiracy.

24   Conspiracy to commit wire fraud.  Conspiracy for money

25   laundering.  Well, what is a conspiracy?  We know it's an

1   agreement between two or more persons joined together to

2   accomplish some unlawful purpose.  I will submit to you there

3   are some things I will agree with the government on.  I agree

4   with the government this case is about intent and knowledge.

5           Let's look at Count One.  What does Count One tell

6   us?  That the defendant and at least one other person made an

7   agreement.  Made an agreement.  But to commit wire fraud, to

8   commit wire fraud.  But the defendant must know -- he knew

9   the unlawful purpose of the agreement and the defendant

10  joined in the agreement willfully with the intent to further

11  that unlawful purpose.  It goes to what the government was

12  telling you, knowledge and intent.  But how do you -- what

13  ways were there to commit the wire fraud?  That a person

14  knowingly devised or intended to devise a scheme to defraud.

15          The scheme to defraud employs false material

16  misrepresentations -- representations, pretenses, or

17  promises.  And the person transmitted or caused to be

18  transmitted by wire or in interstate-foreign commerce in

19  the purpose -- of a writing, sign, signal, for the purpose to

20  execute a scheme.  Here's the most important part.  The

21  person must have acted with specific intent.  It goes back to

22  what the government was saying, knowledge and intent.

23          Let's look at money laundering.  Very similar to

24  what you see with the wire fraud, but the defendant and at

25  least one other person had an agreement, and that agreement

1   was to commit money laundering; that the defendant must know

2   the unlawful purpose of the agreement, and the defendant

3   joined in the agreement willfully, with intent to further the

4   unlawful purpose.

5           The government shared with you there's two ways to

6   commit that money laundering.  The first way is a person

7   knowingly conducts or attempts to conduct a financial

8   transaction.  That financial transaction involved the

9   proceeds of a specified unlawful activity.  What is that

10  specified unlawful activity in this case?  Wire fraud.

11          The person knew the property involved in the

12  financial transaction was the proceeds from the unlawful

13  activity.  And the person knew the transaction was designed

14  in whole or in part to conceal, disguise, the nature,

15  location, source or ownership or control of proceeds of the

16  specific unlawful activity.  That's the first point.

17          What is the common theme?  Knowledge and intent.

18  Knowledge and intent.  And the second way is a person

19  knowingly transports, transmits, transfers, or attempts to

20  transport, transmit, or transfer a monetary instrument or

21  funds from a place in the U.S. to or through a place outside

22  of the U.S.

23          The proceeds -- the financial transaction involved

24  proceeds of a specified unlawful activity.  Wire fraud.  The

25  person knew the property involved in the financial

 1    transaction represented proceeds of some form of unlawful

 2    activity.  The person knew the transaction was designed in

 3    whole or in part to conceal or disguise the nature, location,

 4    source, ownership, or control of the proceeds of the

 5    specified unlawful activity.

 6            So what's the central theme here?  Your fellow

 7    citizen accused, one, enter into an agreement with someone;

 8    two, they must know what they're doing.  Specific intent.  In

 9    the case of wire fraud, that those funds were from an

10    unlawful activity.  The same argument.  It's the same thing.

11    You got to have he knew, intent, for the money laundering.

12            The government shared with you:  The evidence is

13    there.  Trust us.  We're going to talk about that some more.

14    But before we go there, let's talk about the bedrock

15    principles, the bedrock principles, that are with each one of

16    us that protect each one of us.

17            In the State of Texas, in federal courts in the

18    State of Texas, in state courts in the State of Texas, and

19    anywhere else in the great United States of America, that in

20    this case, Dr. Segun Adeoye, is presumed by law to be

21    innocent.  That presumption never goes away; it stays with

22    him from February 26, when we started this trial, and will

23    continue with you in that jury room as you deliberate.

24            MS. RATTAN:  Well, I object.  That's a

25    misstatement.  The presumption can be removed with the

1    evidence.

2                THE COURT:  Overruled.

3                MR. SMITH:  Thank you, Your Honor.

4                Dr. Adeoye begins with a clean slate.  The law

5    doesn't require that Dr. Adeoye prove his innocence or

6    produce any evidence at all.  He could have provided none.

7    You heard from Dr. Adeoye.

8                The government, they tell you they're not afraid of

9    the burden.  That's their burden.  The government has the

10   burden of proving Dr. Adeoye guilty beyond a reasonable

11   doubt.  If it fails to do so, you must acquit.  It's not may

12   acquit.  The judge's law that he gives you in the charge says

13   you must acquit.

14               Reasonable doubt.  This, ladies and gentlemen, is

15   the bedrock.  This is the bedrock that guides as you weigh

16   the evidence, as you weigh the government's evidence in this

17   case.  Their burden to prove each one of these elements

18   beyond a reasonable doubt, this is a standard in which you

19   guide and you weigh their evidence.  And that is reasonable

20   doubt is a base -- is a doubt based upon reason and common

21   sense, reason and common sense -- the government shared that

22   with you in their closing here today -- after careful and

23   impartial consideration of all evidence in this case.

24               Proof beyond a reasonable doubt, therefore, is

25   proof of such a convincing character that you would be

1    willing to rely and act upon it without hesitation in making

2    the most important decisions of your own affairs.

3           Evidence in this case.  Let's first look at the

4    cast of characters as it relates to Dr. Segun Adeoye.  I echo

5    what the government said.  When you are evaluating a witness,

6    you can believe some, all, none, a portion of it.  That's

7    your decision in judging the credibility of the witnesses in

8    this case.

9           Who did we hear from?  We heard from FBI agent

10   Joseph Matthews.  I think we heard from him about four or

11   five times.  We got to know him pretty well.  We got to hear

12   from Agent Keane Richardson, who came in at the very end of

13   the government's case.  We heard from the retired 30-year IRS

14   investigator who now works for a contract for the U.S.

15   Attorney's Office, financial analyst, David Batista.  We

16   heard from Dr. Timothy King, who told you he was paid $20,000

17   for his testimony in this case.  And we heard from Susannah

18   Herkert, who was a consultant who mirrored Dr. King's

19   testimony.  We heard from Julio Lugo, which the government

20   spent a great deal of time explaining him and justifying him,

21   and we're going to talk some more.  We heard from Temitope

22   Adeoye.  And we heard from Edgal Iribhogbe.

23           These are all individuals that are pertinent as it

24   relates to Dr. Adeoye.  But what are some of the central

25   themes?  You know, if you're like me, you drive up and down

1    75 a lot and you see signs that says, "Drink, drive, go to

2    jail." Guess what? That's not the law. It's propaganda.

3    Is it good propaganda? Is it there to help us and guide us

4    and remind us? Sure it is, but it's not the law.

5            Just like in this case, follow the money. Follow

6    the money is not the law. Pill mill, not the law. Money

7    mill, not the law. Red flags. You know what a red flag is

8    when you're out on the beach? It's a warning. It doesn't

9    mean it's absolute.

10           But there was a common theme among their witnesses.

11   Even their government confidential source witnesses used "red

12   flag." And the last thing they said, "At the heart of any

13   fraud is money," is money. Ladies and gentlemen, that's not

14   evidence. That's not evidence. Those are buzz words.

15           I agree in the charge you're going to hear about

16   direct evidence and you're going to hear about circumstantial

17   evidence. And when we think about that, I like to look at it

18   as this: Direct evidence is actual knowledge of a fact.

19   They were there. They saw it with their own eyes.

20   Circumstantial is a chain of events and circumstances

21   indicating that something is or is not a fact.

22           Ladies and gentlemen, as it relates to Dr. Adeoye,

23   think of this case like a chain and they have a broken link

24   in that chain. And that broken link is intent, knowledge --

25   intent and knowledge. Intent and knowledge regarding

1    proceeds of unlawful activity, that's a break in the chain.

2         I'm throwing some words that the government used in

3    their case that I agree with because those words can be used

4    in weighing the evidence of Dr. Adeoye.  "Consistent."

5    "Corroboration."  And "unrefuted."  Those words were used

6    interchangeably amongst some of the governmental --

7    government's witnesses, from their experts, and I think

8    they're good words.  And let's apply those.

9         In this case as it relates to Dr. Segun Adeoye, in

10   their chain they have -- it is their position, the

11   government's argument, that Dr. Adeoye knew the funds that he

12   took from Edgal was from Kim Herbert, that he knew those

13   funds that he took from Kim -- from Edgal was Kim Herbert's.

14   He knew that they were illegal proceeds --

15        MS. RATTAN:  Objection.  Misstatement of the

16   evidence, and also a misstatement of what the law requires in

17   terms of knowledge.

18        THE COURT:  Overruled.  The Court will give the

19   jury instructions of the law that will control.

20        MR. SMITH:  Thank you, Your Honor.

21        I mean, the argument is that he knew that they were

22   for unlawful purposes.  That was their case.  Every bit of

23   that $43,000 they said came from Kim Herbert.

24        Now, let's talk about the other part of their case,

25   is the pill mill or the money mill.  And what was their

1   investigation?  They pulled the data from PMP data and then

2   they went to pontificate, and we're going to break that down

3   a little bit further.  Ladies and gentlemen, that's a broken

4   chain.

5        What do we know -- what was their investigating

6   techniques in this?  And we heard about their investigating

7   techniques.  We heard about what they did in this case as

8   part of their investigation.  Let's see how it applies to

9   Dr. Adeoye.  We knew that they had Title III wiretaps.  Did

10  we ever hear a Title III wiretap from Dr. Adeoye?  No,

11  because it didn't exist.  We heard about surveillance.  Did

12  we ever hear about surveillance of Dr. Adeoye?  No.  It

13  didn't exist.

14       What do we know?  We know that Dr. Adeoye had a lot

15  of bank accounts and he had old bank accounts.  They weren't

16  ones that were open for two months and then closed.  These

17  were long-term established accounts.  And we also know, based

18  on the records in this case, is that this gentleman, my

19  client, complied with the law and filed his taxes.

20       Another part of their evidence in this case is the

21  relationship between Dr. Adeoye and Edgal, because of that

22  relationship, he knew, he knew where the money came from and

23  he knew the unlawful purpose and he participated in it;

24  that's their argument.

25       The other part of their case is their confidential

1    source, Julio Lugo.  Let's talk about that relationship.  It

2    is unrefuted -- one of them buzz words they want to use --

3    that Dr. Adeoye and Edgal were childhood friends.  They met

4    in middle school.  They stayed friends up through high

5    school.  They stayed in contact as they went on in their

6    professional lives.

7           The other thing that's unrefuted is every time

8    Edgal needed something, he went to someone that he trusted.

9    He went to Dr. Adeoye when Dr. Adeoye was in the UAE because

10   his family member was sick and sought guidance and counsel.

11          We also know that when Dr. Adeoye was in the U.S.,

12   in New York when he was doing his residency in Brooklyn, that

13   he reached out to him again for counsel, for advice, on how

14   to handle his wife.

15          Childhood friends don't change.  I may not talk to

16   a friend in years, and they can call me out of the blue and

17   it's like we never, never stopped talking.  I had that

18   experience from a friend of mine of 20 years I served with in

19   the Army.  I lost track of him.

20          MS. RATTAN:  I'll object to bolstering.

21          THE COURT:  Sustained.

22          MR. SMITH:  We've all had those friends, because

23   that's who we are.  Our life, our past, our friends tell the

24   story of us.

25          The other part of that is that when you are from

1    another country and you're here in the U.S., your community

2    is your home country, your fellow members from your homeland

3    that are in the U.S., and that's who you seek advice and you

4    seek counsel.

5              Yes, the evidence from the testimony, they hadn't

6    seen each other in years.  They saw each other in 2019 when

7    they came through.  It didn't mean they weren't -- they

8    didn't talk.  It didn't mean they didn't talk.  How many of

9    y'all have friends that you don't see and haven't seen in

10   years, but you talk to them, you text, "Hope you're doing

11   well," "Merry Christmas," "Happy New Year"?  We all have

12   those friends.  That's part of their evidence is that

13   relationship.  Does that relationship tell you that he knew,

14   he had that intent?  No, it doesn't.

15             Go to Exhibit 25B, Cellebrite data; it's a download

16   of Edgal's phone.  You will see, and I agree, unrefuted,

17   unrefuted evidence, 52 contacts over a four-month period, 52

18   contacts over a four-month period of someone that he'd known

19   since middle school.  Eleven answered calls over four months.

20   Eleven answered calls.  45 calls that went unanswered.  And

21   22 direct messages.

22             I want you to think about and look at the time, May

23   15th of 2020 through September 6 of 2020.  What was happening

24   in our country in 2020?  What began in March and hit the

25   highlight in the Summer of 2020?  COVID.

1          And if you're a doctor, you're working 24 hours a

2     day, 7 days a week, under some of the most harsh, scary

3     conditions that we, as citizens in this country --

4          MS. RATTAN:  I object.  That's outside the record.

5     There is no evidence of that in relation to this defendant.

6          THE COURT:  Sustained.

7          MR. SMITH:  We all lived in the U.S. in 2020.  We

8     know what it was like and the scare each one of us felt as a

9     result of COVID.

10          But let's look at those accounts.  In his part of

11     their investigation, from Mr. Batista, was, "What do I look

12     at in accounts?  If they have multiple accounts and they're

13     short, that is consistent with fraudulent activity.  But if

14     they have long-term accounts, that's not consistent with

15     fraudulent activity.  When you have banks that are small,

16     those are consistent with fraudulent activity."

17          We have a total of seven personal accounts with two

18     banks, the oldest being five years, and the youngest being

19     two.  Long-term consistent accounts.  Then we go to his

20     business accounts.  We have seven business accounts.  That's

21     what people do that are in business; they have accounts for

22     each business.

23          What is interesting.  We have a 30-year IRS agent,

24     we have multiple FBI agents, that have had these banking

25     records and they have combed over these banking records for

1    years now, combed over tax returns for years, and we got one

2    wire that they questioned.

3              MR. RATTAN:  Well, of course, I object.  That's

4    misleading in terms of the law.  And I know that the Court's

5    going to instruct the jury that it's on one occasion.

6              THE COURT:  Again, what the lawyers say the law is

7    isn't what's binding.  I'll tell you what the law is here

8    shortly.

9              Go ahead.

10             MR. SMITH:  Thank you.  Let's talk about what's

11   undisputed.  Undisputed.  I mean, when I say that, Dr. Adeoye

12   stipulates and agrees this is what the facts show, and he

13   even said such when he was on the stand, in that he provided

14   Edgal on May 4th his account number and his routing number.

15   That betrayal I talked about, trials are about betrayal, at

16   the very beginning?  That betrayal of Dr. Adeoye occurred

17   following May 4th, because that betrayal by his childhood

18   friend -- he didn't know that his childhood friend, Edgal,

19   who didn't want to have anything to do with his wife -- what

20   did he do with Dr. Adeoye's account number and routing

21   number?  He sent it to her.

22             Is there any evidence that Dr. Adeoye knew that?

23   Did the government produce any evidence that he knew that was

24   going to occur?  No, they didn't.  And there is no

25   circumstantial evidence to support that either.  No direct or

1    circumstantial evidence.

2           We know that on May 15th, that is when Edgal

3    deposited the money, the three checks -- undisputed -- and

4    placed them into the account of Dr. Adeoye.  Then, from on

5    after that, from the 18th, 19th, 20th, they're calling him,

6    "Come on, Dr. Adeoye, Dr. Adeoye, Dr. Adeoye."  Guess what?

7    Unanswered.  But then on May 22nd, Friday, around noon, that

8    is when Dr. Adeoye got the wiring instructions for the fish

9    company.

10           THE COURTROOM DEPUTY:  Five minutes.

11           MR. SMITH:  Yes.

12           And from there, he did his due diligence, he did

13    his research, and he went on and he wired it.  Undisputed.

14    Undisputed.

15           Then they want to talk about July.  July 2nd there

16    were these checks that never went into Dr. Adeoye's accounts;

17    they were written form.  They want to talk about he sent him

18    texts.  Well, guess what?  On each one of these texts in the

19    government's exhibit, from that period of time, never read by

20    Dr. Adeoye.  That's the evidence, right there.  In July.

21    Never read.  Not part of it.

22           Julio Lugo?  He's a professional witness.  He's

23    working for a sentencing departure.  He listened to

24    Dr. Adeoye.  He manipulated Dr. Adeoye.  This is a pro.  He

25    reviewed his case reports in there.  He wanted to tell you

1    that Dr. Adeoye and Edgal was part of patients' personal

2    information scheme.  Did we ever hear any of that evidence

3    from the government?  No, we didn't.  And he makes him a

4    fraudulent victim himself.  You heard from Dr. Adeoye.  He

5    lost over $700,000 with Julio Lugo's mother.

6          But here's my question I ask you, folks.  Julio

7    Lugo, would you rely and act without hesitation in your own

8    affairs on anything that Julio Lugo said?

9          And if Julio Lugo is their best evidence -- a man

10   that's been convicted multiple times for fraud, who has

11   received sentencing reductions, he's a trained witness --

12   that's the government's case?  That's their best evidence?

13         The PMP data, 219A.  Top pill patients.  Let's talk

14   about Dr. King.  Let's talk about Ms. Heretta (ph).  They

15   didn't review anything else.  They didn't go out and review a

16   file one.  They never went out and talked to any of the

17   patients, let alone they didn't even know when my client went

18   to jail.  They just want to say, "Look, trust me.  I'm a

19   doctor and I'm getting paid $20,000, and this is what I'm

20   here for, folks."

21         Ladies and gentlemen, that is a red herring.  This

22   pill case is a red herring.  Who was the victim in the

23   prescription fraud, or this money mill?  Who was the victim?

24   Have they brought anybody about that?  Was the pharmacy the

25   victim?  Was there actually a patient that came in here?  No.

1    Where is the fraud?  Where is the fraud?  There is none.

2           The fraud?  We heard about it.  Dr. Adeoye had a

3    compromised DEA number.  We know that.  Because he had cash?

4    We're going to talk about that cash here in a second.

5    Patient records were never reviewed.  Nobody can sit up there

6    and say that these diagnosis and this pill prescription

7    wasn't medically reasonable.

8           But you know what's the best evidence in this case

9    that they lack evidence?  Is the government's own evidence,

10   219A, which shows that after he was arrested, his DEA number

11   was still getting used.  We heard from Dr. Adeoye on the

12   stand.  We heard about the steps he took when it got

13   compromised.  We heard about the cloning of this.

14          Guess what?  The government had a chance to rebut

15   what Dr. Adeoye said.  Did we hear from anybody from the DEA

16   that came in trying rebut that from the diversion group, the

17   actual investigators?  No, we didn't.  It's a red herring.

18              THE COURTROOM DEPUTY:  One minute.

19              MR. SMITH:  Cash.  This is what they want to tell

20   you.  We have a businessman, over four years, who made $10

21   million.  Okay.  How many businesses did he have?  And guess

22   what's the most intellectually dishonest thing that they said

23   in this case?  "Oh, look at all that money."  Well, did they

24   talk about the deductions he had for each one of these

25   businesses?  The cost of employees?  The cost of overhead?

1    The cost of his offices?  None of that is broken down here.

2    You're just getting net.  None of that is taken into

3    consideration.  That's intellectually dishonest.

4              And they want to scare you and say, Look at this

5    man.  He's a doctor.  Look how much money he's got.  Ladies

6    and gentlemen, that's not evidence of fraud.  That's evidence

7    of a man that worked three freaking jobs.  That's evidence of

8    a man who was doing telemedicine and who was a hospitalist,

9    who was a traveling doctor.  You can only consider the crime

10   charged:  Wire fraud, money laundering.  Don't fall for the

11   red herring.

12             What does the government say?  "Trust us."  You

13   know what my momma always told my daddy?  "Don't tell me you

14   love me, show me, and then I'll decide."  Don't tell me,

15   government, that he's guilty.  I can decide that.

16             THE COURT:  Mr. Smith, your time is up.

17             MR. SMITH:  Ladies and gentlemen, thank you very

18   much on behalf of Dr. Adeoye.  We know, we trust you, that

19   you'll follow the law and require the government to prove

20   each and every element of the offense beyond a reasonable

21   doubt.  Thank you.

22             THE COURT:  Thank you.

23             Okay, we're going to go take a break.  Ladies and

24   gentlemen, we still have two more defense arguments as well

25   as the government's rebuttal.  So, again, please don't

```
1    discuss the case amongst yourselves or with anyone else.

2    We'll take a break for 15 minutes, come back and continue.

3    Thank you.

4              THE COURT SECURITY OFFICER:  All rise.

5              (Jury exits the courtroom.)

6              (Recess taken.)

7              THE COURT:  Please be seated.

8              Mr. De La Garza, you may make your closing

9    argument.

10             MR. DE LA GARZA:  May it please the Court, counsel

11   for the government, fellow counsels for the accused.  I would

12   like to start off by saying it's been an honor and a

13   privilege to fight for my client, Chidindu Okeke, against the

14   United States of America, the government.

15             MS. RATTAN:  I have to object to bolstering.

16             THE COURT:  Overruled.

17             MR. DE LA GARZA:  We now come to probably the most

18   important time of the trial.  This is where you all get to

19   hear the summations of both sides, which is basically our

20   opinion of what we think the evidence shows and basically our

21   opinion of how we think the law applies to the specific facts

22   that we believe have been presented.

23             What we say is not evidence, only our opinions, and

24   we have plenty.  You have been diligently paying attention

25   for the past two and a half weeks, and we appreciate that.
```

1    We really do.  Because I know you have been paying very close

2    attention to the evidence that was presented and the evidence

3    that wasn't.

4            Who does the burden side with?  This table right

5    here (indicating).  They've had five and a half years on this

6    case.  What they brought you is what they brought you.  And

7    if it's not enough, it's a not guilty, plain and simple.  The

8    burden rests right here, and at no point will it ever go to

9    this side of this courtroom, never.

10           And as we talked in *voir dire*, the presumption of

11   innocence goes all the way until you go into the jury room

12   and you're able to start deliberating.  So what does that

13   mean?  As they sit here right now, they are not guilty,

14   that's what the law requires, until you go back into that

15   jury room and you have all of the evidence and you sit down

16   and you deliberate.

17           And there are some charges that I want to go over

18   with y'all that I think are important, but John Hunter Smith

19   did a really good job of pointing out what's key and what's

20   important.

21           This case is about knowledge, nothing else.

22   Knowledge.  When or when did they not know something.  Now,

23   we all have our job to do.  You've got fine prosecutors,

24   you've got fine government agents, that are here in the

25   courtroom.  They're all doing their job.  I have to do mine,

1    which is try to poke holes in what the government didn't do

2    that I believe they should have done to help you make the

3    best decision you can based upon what you have.

4         They talk about follow the money.  I'm still

5    waiting.  The government goes to China.  We know from the

6    evidence the FBI has attache's in China that could have

7    assisted with an investigation to see if legitimate companies

8    were in China.  They chose -- they chose -- not to do that.

9    They have offices in Thailand.  They chose not to check that

10   out.  These are decisions that they chose.

11        And you need to keep them and make them prove this

12   case beyond a reasonable doubt, the kind of doubt that makes

13   you hesitate to act in one of the most important of your

14   affairs.  One of the things I'm going to ask you to do when

15   you go back and you're deliberating and you're analyzing this

16   evidence would I have heart surgery based on this evidence?

17   Would I?

18        Now, let's focus on Chidindu.  While the government

19   had to make a big deal out of an affair is beyond me, but

20   that doesn't have one thing to do with this case -- nothing.

21        Ladies and gentlemen, you heard from my client

22   yesterday and the day before.  I think what you saw and, in

23   my opinion, the reasonable inference from the evidence, what

24   you saw was a young man that was scared, nervous -- he's not

25   a professional witness -- and having a very experienced

prosecutor gunning after him, asking him questions.  And I

think what you saw was a young man who was frustrated that he

couldn't get his answers out.  But I think what you heard,

and I would submit to you what the evidence will show you, is

that he didn't know that he was betrayed by Sandra.

Now, remember we talked about who has the burden.

Who makes the choices?  Who makes the investigative

decisions?  This table also makes the decisions on who

they're going to cut deals with.  Lisa Wilson, not charged.

The other defendants, getting a deal to plead to one count,

and hopefully -- they're hoping that the government will see

to it that they make a recommendation for cooperation.  So

they've got a very big motive.  And isn't that interesting

how when they are first questioned by law enforcement, "Oh, I

didn't know anything.  I didn't know anything," then, all of

a sudden, "I do know something and let me tell you what it

was."

You know, circumstantial evidence is one of those

kinds of evidence that, yes, if you believe it beyond a

reasonable doubt, you can use it.  But if you don't, and the

jury instructions will direct you, if their case is based on

circumstantial evidence and you do not believe it beyond a

reasonable doubt, not guilty.

This table is perfectly capable of bringing you

evidence.  So if what they brought you is all they have, and

1    you got a problem with it, you're not going to have heart

2    surgery with it, it is a quick not guilty.  End of story.

3            We didn't hear from the most important person in

4    this case, the link.  The link they try to bring you is down

5    over here (indicating).  But where is the evidence that shows

6    that Chidindu knew that the money that was being wired into

7    his account was fraud money?  Did they offer you one

8    conversation from Sandra?

9            They said there were several thousand contacts.

10   Was there one conversation from Sandra -- who we already know

11   from their own evidence that she talks all the time in

12   4-1-9-s, scam, fraud -- there wasn't one that they brought

13   you from her own mouth, from her own typing to Chidindu

14   saying "This money was dirty."  None.  Because it didn't

15   happen.  It did not happen.

16           Yes, what my guy did, operating a remitter

17   business, was wrong.  It's against the law.  And he told you

18   he did that.  Plain and simple.  But they were trying to make

19   money the right way.  And he told you "I would ask

20   questions."  And he asked Sandra, "Is this money clean?"  And

21   based upon her response, he went on with helping her with

22   this work because he believed -- I submit to you it's a

23   reasonable inference from the evidence that he believed it

24   was clean money.  Because he told from you that witness

25   stand -- he made no doubt about it, he told you, "If I knew

1    it was fraud money, I wouldn't have done it."

2            And how do we know that?  By their text messages.

3    They're trying to show you -- yesterday after the very end

4    where they have to call their linguist in again to say the

5    same thing again -- don't mind them when they're trying --

6    some other folks are trying to get them to do some fraud, and

7    they say no.  Because that's not what these boys do, Alex and

8    Steve -- Gerrard, whatever name you have.

9            These two are not guilty of this offense, not even

10   close.  They hustled.  They worked.  And I apologize for

11   going through pages after pages of that notebook, but

12   hopefully that made a point that what they were doing was

13   honest work.  Trading cars.  Buying cars.  Trying to find a

14   way to make a living in the United States, a country they

15   chose to come to, a country that they love.  We even have one

16   serving in the military.  And they get wrapped up in this

17   where they are trying to presume that they had knowledge.

18           Where was the evidence, ladies and gentlemen, of

19   them controlling bank accounts?  We heard from Lisa.  At the

20   very end, I asked her, Don't the banks have the ability to

21   tell who logs in from where, what accounts?  And she said,

22   "Yes."  Where is that evidence?  It doesn't exist because it

23   didn't happen.  It didn't happen.

24           So I submit to you -- and I'm going to be short --

25   that after careful consideration of this evidence, this isn't

1    the type of evidence that I think a reasonable person, and I

2    would submit, you all should not find them guilty because

3    this is not the type of evidence one should have open heart

4    surgery over.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.

7              Mr. Whalen?

8              MR. WHALEN:  May it please the Court, counsel.

9              Good afternoon.  How are we doing?  I know it's

10   been a journey, and we're almost done.  I just want to focus

11   on a couple of areas of the law before we get into what I

12   think is important for you all to consider.  And the first

13   one is, as Mr. Linder talked about, those are four

14   individuals there, and you have to consider their case

15   individually.  And I think that's really important.  And I'll

16   explain to you as we go through why that's important.

17             And the other key thing that I think the Court will

18   give you, is you saw some of the law about conspiracy; it

19   says you have to willfully enter into an agreement.  And what

20   does that word mean?  And what we anticipate the Court will

21   give you is this:  As that term is used from time to time, it

22   means the act was committed voluntarily, purposely, with the

23   specific intent to do something the law forbids with bad

24   purpose, either to disobey or disregard the law.

25             And when we talk about wire fraud, an agreement to

1    commit wire fraud, it's about specific intent to defraud;

2    that you have to agree that what we're doing is I'm intending

3    to cheat somebody, that is my purpose, and you have to do it

4    willfully.  And the same thing as conspiracy on the money

5    laundering; willfully enter into it; that I want to commit

6    the crime knowingly.  And as we talked about and you've heard

7    about money laundering, you have to know that the proceeds

8    came from an unspecified unlawful activity, which is wire

9    fraud.

10          And so as we go through the evidence, there is

11   reasonable doubt as it relates to Alex, because I think I

12   believe Alex is different.  And I want you to focus on Alex.

13          So how did Alex come to the United States?  You

14   heard him testify.  He got an F-1 visa; he applied for it.

15   He came to college.  He followed the rules of the F-1 visa.

16          And you heard -- and I'll come back to this, but

17   you heard who was all involved in this investigation.

18   Somebody from UCIS.  One of the agents testified about who

19   was on the team.  Don't you know that if there was anything

20   improper about his visa, you would have heard about it?  So

21   think about that.

22          He comes to college, and what does he do?  He

23   completes his degree, on the Dean's list, sometimes a 4.0.  I

24   could have only hoped for those grades.  And he actually does

25   it in four years.  And he tries to get a job.  But he has to

1    then adjust, but he can't, so he goes and he gets a master's

2    degree, 4.0.

3            But he also decides, because you heard from him, I

4    wanted to serve and be part of something bigger.  And there's

5    a program that allows people who join the military to become

6    United States citizens.

7            So he applies to the United States Army.  And what

8    did you hear him say?  He applied I think in 2015.  And it

9    took 20 months for the Army to vet him to make sure he was a

10   suitable candidate for service.  He gets accepted.  Along the

11   same lines, he's applying for citizenship through UCIS.  They

12   put off his interview because they had to do further

13   investigation.  He gets his citizenship.  Vetted by not one,

14   but two, government agencies to become a United States

15   citizen and to serve in the United States Army.

16           Alex is different.

17           And so when you look at the evidence that you have,

18   especially when you look at the money laundering issue, about

19   concealment, Alex opens all his bank accounts with his own

20   name; there's no fake identities; his Social Security number.

21   There's no hiding anything there.  Nothing he did about

22   opening those accounts was improper.

23           And you also heard talk about structuring.  There's

24   no evidence in this record about structuring.  Now, they

25   tried to show him on cross-examination, "Oh, here's a $9600

1    deposit.  Here's a $9800 deposit."  Look at the time frame on

2    those.  You saw evidence that structuring, "I put some in one

3    day.  I put some in the next day."  Look at the time frame.

4         They tried to put them side by side and conflate

5    it, but there's no structuring.  He deposits every bit of

6    cash in those bank accounts.  And they're right.  The bank

7    accounts and the records say what they say.  He deposited

8    that cash.

9         But then let's talk about trying to conceal.

10   They're CTRs.  The Cash Transaction Reporting, you heard

11   David Batista and everyone else talk about, it's reported to

12   the IRS if it's over $10,000.  And he deposited one time

13   $140,000 cash.  If you're trying to hide that fact, wouldn't

14   you do something else?  There's a known report involved.

15        And then you wire it out of the country; that

16   creates a record.  There's a depository, I think in New York,

17   that keeps track of all these records, and they're all tied

18   to your Social Security number.  That's not concealment.

19        And the other key point, too -- and we'll talk

20   through this -- is you heard the testimony of an Agent

21   Richardson, and they did the chart over there.  And I think

22   he testified to it, but the evidence shows it, there is not

23   one penny of any money from any victim in any of Alex's

24   accounts.  There is not one penny in there.  There's no one

25   heard from David Batista or anyone on this side that traced

1    any money and put it in his account.

2             Alex is different.

3             There's no incoming wire to any of his accounts

4    from any victim, in Alex's accounts.

5             Alex is different.

6             So what is the case that the government presented

7    to you?  And we heard a lot of excuses about, well, the

8    evidence is voluminous; cash is hard to trace; can't follow

9    the money when it goes overseas.  But it's their burden to

10   prove this to you beyond a reasonable doubt.

11            And I have to mention at this point, when you heard

12   the government's opening statement to say the defense is

13   trying distract you, why would they say that?  Because,

14   really, haven't they been trying to distract you through

15   their presentation of the case?

16            For example, let's talk about the text messages.

17   You had Agent Richardson come up here and saying the Okeke

18   brothers had 3,347 contacts.  He shows you four maybe bubbles

19   of chats out of that 3,347 contacts.  But I think it's also

20   interesting that -- if you have the time, and I hope you do

21   and take the time, go back and look at Exhibit 31C, pages

22   1029 through 1032.  Alex and Chidindu have 13 contacts.  What

23   do they talk about?  Getting a haircut.

24            And so they want to take this number and blow it up

25   and say look how much time they're talking to each other.

1    But it's totally out of context.  They're brothers.  They're

2    going to have conversations.  But if you take 13 contacts

3    just to talk about a haircut, go to dinner, or you go into

4    the club, but what did they show you that they believe ties

5    Alex into this money laundering/wire fraud conspiracy?  Not

6    to belabor the point, but they showed in the direct

7    examination the phrase "dating"; right?  But on

8    cross-examination -- scroll up -- what does uday minda (ph)

9    mean?  "I don't know."  They never asked Kingsley on direct

10   examination when he testified the first time.

11          And then he -- then they bring him back to say the

12   exact same thing Alex said.  "Don't mind him."  And Alex told

13   you what that meant.  But they want to have Kingsley Iheme

14   come in here and try to guess what they meant.

15          And then they cross-examine Alex about texts that

16   Peter Omeiri sent.  Who is the best person to do that?  They

17   never asked Peter Omeiri that.  It's because they didn't want

18   to know what the answer was.

19          So I'm not here to distract you.  I'm here just to

20   tell you to look at the evidence they presented to you.

21   Because what I think -- I don't think -- what they've been

22   trying to do is, in my view, lump Alex and Chidindu together

23   because they keep saying "the Okeke brothers, the Okeke

24   brothers, the Okeke brothers."  No.  It's Alex.  What did

25   Alex do?

1           And as I said, there's no wire of any money into

2    his accounts.  He only dealt in cash.  He had no knowledge of

3    any fraud with Sandra.  There's no text messages between him

4    and Sandra.  And how many times did we talk about this Google

5    Drive of Sandra's, and asked Agent Richardson, how many

6    terabytes?  Who knows?  It was voluminous.  There's not one

7    mention of Alex in that Google Drive.

8           Alex is different.

9           The evidence doesn't show he engaged in any

10   criminal activity.  But they want to compress the timeline,

11   they want to compress Alex and Chidindu, because the hope is

12   that you'll find Alex guilty.  That's what they're trying to

13   do.

14          So it was refreshing to hear the government concede

15   that they were engaged in a wire transmitting business, an

16   exchange business.  That's what Alex was involved in.  That's

17   what he told you.  And now they verified it that what he was

18   telling you is true.  But now they want to say, no, he's

19   involved in fraud.  And how do they do that?

20          So on the one hand, they say don't believe -- you

21   can find him guilty, all these defendants guilty, without

22   even considering the cooperators.  That's not true.  Okay,

23   take away the cooperators.  The evidence is woefully

24   insufficient and they know that.  And they say, "Oh, we

25   brought you cooperators."

1          Let's talk about Mr. Asare.  They want you to

2     believe this narrative.  And it was interesting, if you

3     watched the cross-examination of Alex, the government kept

4     saying "You recruited him, you recruited him, you recruited

5     him," because that's the narrative they want you to believe.

6     But it's not true.  It's not what Mr. Asare testified to.  He

7     sought Alex out.  They met through their girlfriends.

8          And then they want to say the money that came into

9     the Isarko account, Alex directed him to open.  And we showed

10    you yesterday -- go to the bank records -- he opened that on

11    his own in 2017, a year before he met Alex.  So why do they

12    want to keep telling you over and over again, "He directed

13    Isaac, he directed Isaac"?  Because that is one of the few

14    connections they can make back to any victim.

15         But what did Isaac tell you?  Isaac told you, "I

16    didn't agree with anyone to violate the law.  I didn't agree

17    with anyone to engage in money laundering.  I only dealt with

18    Alex in cash."  So as Isaac Asare sat here, he told you "I

19    didn't do anything wrong."

20         And so then the question becomes, why would

21    somebody plead guilty to something they didn't do?  And I

22    think it's important.  Isaac Asare's been in jail since

23    September of 2021.  He's afraid he's going to miss seeing his

24    father.  He made a business decision.  "I need to get back

25    home to see my dad."  I can't blame him for that.  But you

1   have to analyze what he testified to carefully, and it

2   doesn't connect Alex to wire fraud or money laundering.

3           And so the next thing comes -- you know, Mr. Asare

4   testified to that.  His testimony I would say wasn't really

5   helpful.  So then Mr. Omeiri comes in.

6           What do we know about Mr. Omeiri?  They showed you

7   texts, the text messages.  But he comes and says, "Nope.

8   They told me I was going to commit wire fraud.  They told me

9   that."  He met with law enforcement.  He didn't admit to

10  anything about wire fraud.  He didn't think he was doing

11  anything wrong, but he gets indicted.  He doesn't get

12  detained.  And a month later, he pleads guilty and says "I

13  committed wire fraud."

14          And it was interesting the words people use.

15  Because Mr. Sandel cross-examined him and said, "Do you know

16  what substantial assistance means?  Do you know what

17  substantial means?"

18          "No.  I don't know what that word means."  But

19  somehow he was able to say "I minimized in that interview.  I

20  missed the red flags."  Where do you think he got that

21  suggestion from?

22          But Omeiri's kind of a mixed bag because he doesn't

23  say what the government wants him to say.  Because when they

24  asked him what's going on here with these text messages,

25  "It's cash and there was nothing wrong with it; it was a

1    legitimate source of the money," both on direct examination

2    and cross-examination.  But he has to say what they want him

3    to say, and he works at it by saying "I minimized."  Was it

4    fresh in his mind back then?  Yes.  But he never got

5    detained.  He got indicted later.  And now he conveniently

6    comes in here and says --

7              MS. RATTAN:  Your Honor, of course, the detention

8    issue is up to the Court, and that's misleading.

9              THE COURT:  Go ahead.

10             MR. WHALEN:  And he comes in and says, "Alex was

11   involved."  He's not reliable either.  That doesn't help

12   their case.  But that's a reasonable doubt as well.

13             And they keep saying they had agreements, they had

14   agreements, they had agreements.  But an agreement without

15   unlawful purpose means nothing.  You have to agree to violate

16   the law.  Alex never agreed with anyone to violate the law.

17             And they talk about cash as income -- they repeat

18   this idea about cash and taxes -- it's not reported.  What

19   did Alex tell you?  "I reported my taxes."  He even amended a

20   return.  He filed his taxes in 2019, 2020, 2021.  In 2021, he

21   reported $140,000 of income.  And what is interesting, they

22   have that chart, and then they say it's undetermined because

23   they don't have the return for some reason.

24             This case was investigated for five years, and the

25   IRS was involved.  And the IRS can't find your tax returns

1    that you filed?  Because they didn't say he didn't file them.

2    "We just didn't have them."  Think about that.  And he told

3    you how he filled out his tax returns.  He used a CPA.

4    That's not somebody trying to underreport.  But the tax

5    thing's really a red herring.  The concealing thing on the

6    tax return -- it's in his bank account.  He reported his

7    income as he knew it to be based on the advice he got from

8    the CPA.  So think about these things.

9            And going back to Peter Omeiri.  You know, they

10   talk about corroboration.  And Peter Omeiri said, "Oh, he

11   gave me all this money so often."  Where's his bank records

12   to corroborate what Peter Omeiri said?  We've got everybody

13   else's, but we don't have his?  Those are questions you need

14   to ask yourself because those are reasonable doubts.

15           Those companies, there's no research on these

16   companies, legitimate companies, selling legitimate goods.

17   There's nothing to contradict that.

18           And here's the other question, too.  I think they

19   want you to believe that Alex controlled their accounts, all

20   right.  They want you to believe that because they have to

21   get you to believe that because if you don't believe that,

22   he's not guilty, they can't prove their case.  Why would

23   Peter Omeiri send him pictures of deposits if he's got access

24   to their account?  Why would he have to prove "I deposited

25   the money"?  Ask that question, too.  And the hope is, you

1    know, that if they keep repeating this over and over again,

2    people will believe it.  But study the evidence in the case

3    because I think the timeline is important.

4            We all know that Chidindu got arrested in September

5    of 2021, and you saw his arrest.  And you saw Alex -- the

6    search of the house, okay.  Remember, there was evidence that

7    there weren't any body cams that existed, but we brought you

8    the body cams for you to see.

9            But Alex knows his brother got arrested.  And a

10   year later, they arrested him in Houston.  Now, I can

11   guarantee you that if somebody saw their brother get arrested

12   and thought they were guilty and they fled to another

13   country, they would say that's evidence of guilt.  He didn't

14   go anywhere.  He stayed right in Houston, Texas, because he

15   didn't do anything wrong.  And then he gets arrested.

16           They release him and they say you need come back to

17   court because we've got to revisit that decision.  And he

18   shows up voluntarily, even after he's charged, and he gets

19   detained.  That's not somebody who has a guilty mind, who

20   believes they acted in a criminal way.  And the evidence

21   shows you that.  They didn't prove that to you because he's

22   not guilty.

23           And let's talk about the cash he picked up.  What

24   are the things that he did, he testified to?  "I picked up

25   cash from my people my brother told me to go to" -- his older

1    brother.  "I made my own observation about these folks and

2    satisfied myself that they owned businesses, they have

3    legitimate sources of income."  He took those steps to do

4    that.

5            He also was involved in other businesses, Vibes Bar

6    and Grill.  Nobody contradicted that.  They're running that

7    business.  Kaylex (ph) Transportation.  You saw those cars

8    and you saw the trailer.  He's driving, hauling cars across

9    Texas and Louisiana.  They're running businesses trying to be

10   an entrepreneur, live the American dream that he came to this

11   United States for.

12           Alex is different.

13           And so Alex testified to you.  His explanations to

14   you were reasonable, credible.  Those are reasonable doubts.

15   And what he told you in his explanation is just as reasonable

16   as what the government wants you to believe.

17           And it's interesting they talk about, you know, the

18   scenario about circumstantial evidence and that someone comes

19   in and their boots are wet; someone comes in, their

20   raincoat's wet --

21           THE COURTROOM DEPUTY:  Five minutes.

22           MR. WHALEN:  -- someone comes in, they're carrying

23   an umbrella, and they think it's raining.  But then if you

24   open the door, you realize somebody hit a fire hydrant and

25   it's blowing up all over the place.  Is that a reason why

1    somebody might be wet?

2          So circumstantial evidence doesn't necessarily

3    mean -- they want it to mean what they think it means, but

4    what they've showed you is not what they think it means.

5    Those are reasonable differences.  Those are reasonable

6    doubts.

7          Alex is different.

8          There's no connection to Sandra.  There's no text

9    messages with Sandra.  There are no wires in his account.

10   Alex is not guilty of either count.  I ask you to find that

11   verdict on behalf of Alex.  Thank you.

12         THE COURT:  Thank you.

13         Okay.  Would the government like to conclude the

14   argument.

15         MS. RATTAN:  Yes, Your Honor.  Thank you.  May I

16   have just a moment?

17         THE COURT:  Yes.

18         MS. RATTAN:  May it please the Court, members of

19   the jury.  Thank you for your time and attention.  I know

20   it's been exhausting.  And thank you for continuing to

21   listen.

22         Let me point out this victim to you, Rod Koenen.

23   He came and he testified, and he's a lawyer, and he got

24   scammed.  And he said, "I can't believe I fell for it.  I

25   cannot believe I fell for it."  But he got scammed.

 1            They're sophisticated, educated, and very slick.

 2     And what's happening here?  Trying to scam you.  That's what

 3     they're trying to do.  It's quite the scam.  Is it a

 4     sophisticated international scheme?  Yes, it is.  Is it

 5     complicated?  You bet.  But if you follow the money, you'll

 6     know that each one of these four defendants was involved.

 7            Now, Judge Mazzant is going to read you the jury

 8     instructions in just a minute after I conclude my remarks.

 9     But on page 16, he's going to tell you exactly what you have

10     to find in order to find the defendants guilty of conspiracy.

11     He'll tell you what the elements are, and those are the

12     things that you have to find.  But he'll also tell you this:

13            One may become a member of a conspiracy without

14     knowing all the details of the unlawful scheme or the

15     identities of the other alleged conspirators.  If a defendant

16     understand the unlawful nature of a plan or scheme and

17     knowingly and intentionally joins in that plan or scheme on

18     one occasion -- one time.  All it takes is one time.  You've

19     heard a number of years of evidence, but all that's required,

20     and they are in the instructions that Judge Mazzant will give

21     you, is that the defendant intentionally and knowingly on one

22     occasion involved himself in a conspiracy to commit wire

23     fraud or money laundering.  One time, on one occasion, with

24     one other person, that is sufficient to convict him for

25     conspiracy, even though the defendant didn't participate

1    before and even if the defendant only played a minor role.

2          The government doesn't have to prove that an overt

3    act happened in furtherance of the conspiracy, which, of

4    course, you know that there has been.  The government need

5    not prove that all the alleged conspirators entered into any

6    formal agreement, nor that they directly stated between

7    themselves the details of the scheme.  That's not required.

8          The only thing that's going to be required is that

9    you find that each one of these defendants on one occasion

10   entered into an agreement to commit the crimes charged, and

11   that's wire fraud and money laundering.

12         One of the attorneys who spoke to you talked to you

13   a lot about intent; you have to know, you have to have

14   knowledge.  And definitely Judge Mazzant is going to have

15   information for you about intent in the instructions that you

16   get, but he's also going to tell you that you may find the

17   defendant had knowledge of a fact if that defendant

18   deliberately closed his eyes to what would otherwise have

19   been obvious to him.

20         You can't look the other way.  You can't be

21   deliberately ignorant or willfully blind to facts that would

22   otherwise be obvious.  And if you are closing your eyes and

23   looking the other way, you're guilty.  That's knowledge.

24   That's intent to enter into a conspiracy and intent to enter

25   into an agreement.  That's what the law is, and Judge Mazzant

1    will review that with you.

2          Now, the first attorney that we heard from was

3    Edgal Iribhogbe's attorney.  Edgal Iribhogbe's attorney told

4    you that Edgal knew -- he knew, and he reviewed with you the

5    messages between Edgal and Sandra where Edgal is saying,

6    "You're a fraud.  You're a scam.  Stop doing it.  I don't

7    want to Be part of it."  Those are messages between the two

8    of them.  They bicker on and off through the conspiracy.

9    "You're a bigger fraud.  You're a bigger fraud."  Who's a

10   bigger fraud.  They bicker like a married couple, but they're

11   not bickering over who's taking out the trash.  They're

12   bickering over fraud schemes and over money.  And they did

13   have that conversation.

14         But according to counsel for Edgal Iribhogbe, he

15   knew in September of 2020 that Sandra was a fraud.  Of

16   course, the evidence shows he knew it well before that, or at

17   least was deliberately ignorant or willfully blind to it.

18         But let's look at messages that were exchanged

19   between Sandra and Edgal after Edgal says "I know that you're

20   a fraud."  These messages are taken from Government's Exhibit

21   35B, and that's Sandra Iribhogbe's phone.  And it's from --

22   we know she calls him "Oseme."  It's from her husband, Oseme.

23   And she's telling him, "300 k is available, but the guy to

24   effect release is gone for Easter.  Let's see if we can bring

25   him back by Tuesday.  Tomorrow and Monday are a public

1    holiday."

2              They're talking about -- this woman, who she is the

3    mother of his children and that's the only reason why he's

4    nice to her.  He knows she's a scammer.  This woman, who she

5    says he knew and traded these messages with in September of

6    2020 -- what date is that?  It's April of 2021.  And what are

7    they talking about?  Still talking about money.  They're

8    still doing deals together.  $300,000.

9              And then what do you see on April 15th?  This is --

10   it's from Oseme.  So it's from Oseme, it's from Edgal

11   Iribhogbe, and it's to Sandra.  And what does Edgal say to

12   Sandra?  "Done with the 100 k.  Waiting for credit on the

13   other 100 k."  They're still doing money deals together, even

14   though he tells you in his own closing argument that he knew

15   she was a scam in November or September of 2020.

16             What else do we know?  And this is again from

17   Sandra Iribhogbe's phone, and it's from Edgal, Oseme, and he

18   says, "The other person just came in with the 100 k."

19             A conspiracy?  An agreement?  You bet.  That's what

20   they're talking about.  They're talking about money.  They're

21   talking about stolen money.  And you know, based on their

22   history together, what they're doing and what they're talking

23   about.  Let's see.

24             This is Jane Roe.  And here's the thing.  Jane Roe,

25   of course, is a victim, and she sent $80,000 to Benedicta

1    Atakare.  Benedicta testified in this trial and she said,

2    "I'm a scammer.  I pled guilty to scamming.  I was working

3    with Sandra Iribhogbe."  But what did Benedicta Atakare do?

4    She got mad at Sandra Iribhogbe because she felt like she

5    wasn't getting a big enough percentage.  She had been doing

6    it, and doing it, and doing it.  She thought she should get

7    more money.  So she knows it's all stolen money, and Sandra

8    can't call the police if she steals the money.

9         So Benedicta Atakare stole the stolen money.  It's

10   a couple of themes that we've seen a couple of different

11   times during the trial.  She stole the stolen money.  So when

12   the wheels come off and things get real and the $80,000 is

13   gone and Benedicta is not turning it back over, who gets

14   called in?  Who shows up at Benedicta's door?  Who was it?

15        It was Edgal Iribhogbe.  He's the henchman.  He's

16   the collection man when something goes wrong.  Because you

17   can't call the authorities.  It's dirty money.  He's the one

18   who showed up.  He knew there were threats going on because

19   the threats were on his phone.  The threats against Benedicta

20   Atakare and her husband, Matthew Okpu, were on Edgal

21   Iribhogbe's phone.  He says that he showed up.  He admits it.

22   He says, "I just went to the door."  Because he probably

23   thinks a picture was captured on her door cam.  He says, "I

24   just went to the door.  That's all I did."

25        Benedicta Atakare says, "He was there to get the

1    money and I gave him the money."  He says he didn't get the

2    money.  But then coincidentally, if you look at his bank

3    account, what happens?  Edgal's bank account, Government's

4    Exhibit 131, page 15, he deposits -- right after the records

5    show that he gets back from the D.C. area, he deposits right

6    about $50,000 in his own bank account.  The records are the

7    flight records, the bank records.  Everything shows that it

8    was Edgal Iribhogbe.  He even said on the stand that he went

9    out there, that he went out there to collect the money.

10           Is that a conspiracy?  Is that an agreement?  You

11   bet it was.  And Jane Roe had sent in her money.  Benedicta

12   detained the money, and Edgal Iribhogbe went to pick the

13   money up.

14           What else do we know about Edgal?  We know that

15   Edgal is right in the middle of the stolen money from Kim

16   Herbert.  Kim Herbert, on April 29th of 2021, sends in, first

17   of all, $25,000.  And then on May 2nd of 2021 she sends a

18   second $25,000.  And you've got the wires there.  And Kim

19   Herbert carefully writes on the wires that it's Ely Pence

20   because she thinks it's General David Rodriguez's attorney

21   who she's sending the money to.  So it's right there on the

22   left side of the screen.  These are Kim Herbert's wires that

23   she sends in.

24           And then you know that it's Segun Adeoye who is

25   going to provide his account to send the $43,000 to the fish

1    company over in Japan.  So you've got Segun Adeoye, on the

2    very same day -- you've got his phone there on the far

3    right -- the very same day, May 2nd of 2021 that Kim

4    Herbert's money comes in, Segun Adeoye provides his account

5    information to his friend.

6              Now, you have to know that when we talk about

7    deliberate ignorance or willful blindness, certainly, that's

8    exactly -- I think he knew what he was doing, definitely, but

9    willful blindness certainly applies here.

10             MR. SMITH:  Object to counsel's personal opinion.

11             THE COURT:  Sustained.

12             MS. RATTAN:  Base your verdict and base it, of

13    course, on the evidence and what you see there.

14             But Segun Adeoye can't deliberately look the other

15    way to what's otherwise obvious.  What do we know about every

16    witness who testified that they grew up in Nigeria?  Kingsley

17    Iheme grew up there.  Benedicta Atakare grew up there.  Peter

18    Omeiri grew up there.  What do they all say?  It's cultural

19    knowledge.  Everybody knows what 4-1-9 is.  Everybody knows

20    what scamming is.

21             Segun Adeoye grew up there.  He lived there for

22    over 20 years.  He knows what scamming is.  So you can't

23    divorce him from who he is and from his background and where

24    he was raised.  And his childhood friend approaches him and

25    says, "Hey, I got this deal.  There's an $80,000 deal, and

```
 1    our old buddy, Solomon Esekheigbe, is involved, too.  I've

 2    got this $80,000 deal.  And I'm going to get you on the next

 3    one."  Then he sends him the $43,000.  And the $43,000 is

 4    what Segun Adeoye sends to the fish company in Japan.  Fish.

 5    Fish.  Really?  That's pretty fishy.

 6            And it's not just a normal transaction, because

 7    Edgal Iribhogbe takes pictures of the cashier's checks that

 8    he's putting into Segun Adeoye's accounts.  And the pictures

 9    show -- and you've seen the blow up of it -- it's not just

10    one check for $43,000, it's three separate checks -- one,

11    two, three -- three separate banks, written on the exact same

12    day.  And he takes those three checks, he sends pictures of

13    them to Segun Adeoye, and puts them in Segun Adeoye's

14    account.

15            Segun Adeoye does not immediately transfer the

16    money.  He waits and he waits.  And defense counsel, during

17    his closing argument, points out that there are a number of

18    missed calls where Segun -- where Edgal Iribhogbe is trying

19    to reach Segun Adeoye.  They want the money transferred.

20    He's not answering.  He's not picking up.  Missed calls.

21    Missed calls.  Missed calls.

22            Well, that's interesting because that fact that the

23    calls were missed corroborates what Julio Lugo tells you that

24    Segun Adeoye told him in that jail cell.  He said, "Segun

25    Adeoye said 'I was avoiding Edgal Iribhogbe.  I was mad.
```

1    There was a swindle before that we were involved in and he

2    cheated me out of money.'"  And he says what?  "I was

3    considering stealing the money."  It's a common thing.

4            We know Benedicta Atakare stole the money.  We know

5    Peter Omeiri stole the money.  And Segun Adeoye told Julio

6    Lugo that he was considering stealing the money because he

7    was mad.

8            Missed calls.  Attempts to reach him.  Finally, he

9    does reach him, and Segun Adeoye ultimately does send the

10   money.

11           Another thing that counsel for Segun Adeoye says,

12   that he didn't know that Sandra Iribhogbe was involved; that

13   he was very disappointed in his friend, Edgal Iribhogbe, for

14   not telling him that Sandra was involved.  Because somehow,

15   if he knew Sandra was involved, everybody knows she's a

16   scammer, so he wouldn't have done the deal.  Is that what

17   he's saying?

18           Well, he says he didn't know that Sandra Iribhogbe

19   was involved, but one of the text messages is right here, and

20   this is Government's Exhibit number 18.  It was admitted as a

21   demonstrative exhibit only, so this isn't something that

22   you'll be able to take back to the jury room with you.  But

23   you'll remember the day in court we went through this and it

24   tracked play, by play, by play exactly how the fish

25   transaction took place when Segun Adeoye sent the money over

1    to Japan.

2            And what does this text message say right here?

3    It's a text message from Edgal to Segun and it's on the 19th.

4    And remember Segun doesn't ultimately send the money until

5    the 27th.  And the text message says, "Please, Segun, do not

6    send any funds yet.  Disregard the message from my wife."

7            Well, Edgal Iribhogbe comes to trial, and Segun

8    Adeoye comes to trial and says "I didn't know the wife was

9    involved.  If I'd have known that scammer was involved, I

10   would've known it was a bad deal."  It's right there in black

11   and white.  These are the records, the bank records, the

12   communications.  These are the records that don't lie.

13           He texted him and says, "Please don't send any

14   funds yet.  Disregard the message from my wife."  This tells

15   you something else.  It tells you about who's in charge.  Is

16   it Sandra who's in charge?  Or is it Edgal who's in charge?

17           And when you think about who's in charge, Sandra or

18   Edgal, you can look at the wiretaps and the interceptions

19   there.  There's an interception on -- it's Government's

20   Exhibit 71B, it's the transcript, and it's page 24.  Here's

21   what Sandra says about Edgal when she's talking about

22   somebody else.  She said, "Mr. Edgal has been identified as a

23   fraud with Chase.  So because of that, he will just die?  No.

24   He will move on.  He will."

25           He's a fraudster hero to her.  Just because Chase

1    closed him down doesn't mean he's going to stop.  She's on

2    the phone bragging about her husband and what a good

3    fraudster he is.  "Chase shut him down?  Will he just die?

4    He'll move on.  He will," is what she says about him.

5           And then counsel for Edgal Iribhogbe talks about

6    the phone call where they're bickering about fraud, and

7    that's Government's Exhibit 79B, and they have an argument.

8    And basically it's Edgal telling Sandra that she's not doing

9    the fraud right, and that he's in charge, and that he's going

10   to be traveling to all these international places, and she

11   just needs to do her role.

12          Then he goes overseas.  And he's mad because he

13   doesn't want her talking to his people overseas, and what he

14   says there is, "Sandra --" and this is Government's Exhibit

15   79B, page 12, and he's telling her, "Did you talk to them?

16   What did you say to them?  Did you tell them where you are?

17   Did you tell them that I have family in Dallas?  He doesn't

18   know I have family in Dallas.  I'm telling you that's a

19   problem."

20          Why would Edgal Iribhogbe not want Sandra talking

21   to his people overseas, and why would he be upset if she said

22   that she's in Dallas?  These are serious people.  These are

23   dangerous people.  They are laundering stolen money back to

24   Nigeria.  And Edgal's not having it.  And in this

25   conversation, as you read it, Edgal says "I usually use this

1  account by the name of a guy named 'Moore.'  I'm not able to

2  use his account now because they caught him running a racket

3  in his account.  I'm doing something I don't normally do.

4  I'm going to run the money through my account."

5       Look at the transcripts.  They're talking.  They're

6  married and they're bickering about their fraud scheme.

7  That's exactly what it is.

8       There's another call, it's Government's Exhibit

9  81B, and it's page 4, where they're talking about their

10  fraud, and at the very end of the conversation, Edgal says to

11  Sandra, "Please call me on WhatsApp.  Don't discuss these

12  kinds of things with me on this phone.  Let me call on your

13  WhatsApp."  He doesn't want her talking on that phone.

14       Evidence of a conspiracy?  Of course it is.

15       Now, Segun Adeoye points out that the government

16  doesn't have a wiretap on his phone, and we don't.  But what

17  we have is Temitope's phone.  And what do you know about

18  Segun Adeoye's fraud business, fraud prescription business,

19  from looking at Temitope's phone?

20       We know that he's letting Temitope change the pain

21  pills.  He's telling Temitope to issue prescriptions and sign

22  for me.  It's a pretty loose and reckless business that he's

23  involved in.  And Dr. King comes and testifies he looks at

24  his PMP data, his Prescription Monitoring Program data.  And

25  it shows what?  He's a money mill.  He's a pill mill.  He's a

```
 1    pill doctor.

 2              Now, the government has the burden of proof.  We

 3    always carry the burden of proof.  But each one of these

 4    defendants, each one of them, has an absolute right to

 5    present any evidence to you that they think would be

 6    important.  And don't you know, if he weren't running a pill

 7    mill, he would subpoena those patients.  The patient number

 8    one on Dr. King's list, Christopher Bushi --

 9              MR. SMITH:  Objection, Your Honor.  It's shifting

10    the burden.

11              THE COURT:  Again, the defense has no burden

12    whatsoever.

13              MS. RATTAN:  They have no burden, but they

14    certainly have a right.  Patient number one, he even claimed

15    on the stand was his patient.  And Dr. King said that of all

16    the patients that he reviewed, that person was getting the

17    most pills, and the drugs were being dealt the most to that

18    person.  Where's Christopher Bushi?  You heard from Special

19    Agent Richardson, Keane Richardson, that they tried to find

20    the patients.

21              MR. SMITH:  Objection.  Shifting the burden.

22              THE COURT:  Overruled.  I have already indicated

23    the government has the burden of proof.  The defendant has no

24    burden.

25              Go ahead.
```

1              MS. RATTAN:  They were investigating and trying to

2      find the patients, and what they found was that their numbers

3      had been changed.  They basically couldn't find the patients.

4              Dr. King, in his report, said "I would like to see

5      some patient files.  If you have some patient files, I would

6      like to see if you --"

7              MR. SMITH:  Objection.  Shifting the burden.

8              THE COURT:  Overruled.

9              MS. RATTAN:  "-- if you documented, how you were

10     appropriating treating these people with these pain meds."

11             What we have is the PMP data because that's the

12     public database that's available.  Everything else would be

13     something that he would have to document and prove that he

14     was treating his patients properly.  There is no proof of

15     that because he was running a money mill, he was running a

16     pill mill.  And those communications with Temitope are

17     demonstrative or demonstrate what type of business he was

18     running.

19             And the fact that he was running a pill mill and

20     fraudulently issuing prescriptions supports the fact that he

21     was involved with his childhood friend, Edgal Iribhogbe, in

22     laundering and moving the money that Kim Herbert had

23     provided, thinking that she was giving it for her love

24     interest, General David Rodriguez.

25             That's what the records show.  They show that they

1    both knew that his wife was involved -- both of them.  They

2    show that three separate checks were cut.  He's looking the

3    other way, not knowing or paying attention to what would

4    otherwise be obvious, that this is a 4-1-9 scam.  And he's

5    moving the money out of the country after a delay -- after

6    Edgal Iribhogbe's trying to reach him, trying to reach him,

7    he's moving the money out of the country.

8            The money came into his account.  It was fraud

9    money.  The money went out of the account, it was laundered.

10   You cannot be willfully blind or deliberately ignorant to

11   something that would otherwise have been obvious.  You put

12   together his fraud with his pill mill, you put together the

13   fraud that he's doing with Edgal Iribhogbe, and you listen to

14   what Julio Lugo says.

15           Is Julio Lugo someone that any of us would rely on

16   anytime?  It's interesting, though, that he knows inside

17   details that nobody else would have known.  He knows they

18   were having conception problems.  He put them together with

19   his mother to do a real estate deal.  They knew each other.

20   They were talking every single day.

21           And what do we know that Julio Lugo says?  That

22   Segun Adeoye told him he knew it was fraud and that he was

23   mad about it because he didn't get any money out of it.  And

24   that's what the evidence shows.  They cheated him out of his

25   fee.  How would Julio Lugo have known that?  Was he doing a

 1    certified public accountant review of the bank accounts in

 2    the jail cell?  I don't think so.  He knew that Segun Adeoye

 3    got cheated, and Segun Adeoye was mad about it.

 4              So what else do we know?

 5              The Okekes.  Counsel for Alex Okeke says that "Alex

 6    is different."  And Alex is different because to whom much is

 7    given, much is required.  He's come to this country and he's

 8    availed himself of every benefit, and he's been in our

 9    military.  We expect something better than what he's done, of

10    someone who's been involved in our military.  He's different.

11    He should be held to a higher standard, and certainly he

12    shouldn't be involved in this kind of activity.

13              But what do we see about the Okekes?  They're

14    brothers.  They live together.  And not only do they live

15    together, but they've had over 3,000 contacts.  It's not

16    enough to live in the same house.  They're in contact with

17    each other constantly.

18              And we know something else about them.  When each

19    of them was arrested and they were asked where they work, we

20    know that Alex said "I worked in the military.  My history is

21    that I worked at Dick's Sporting Goods.  I had Kaylex

22    Transportation."  He lists several places where he's worked,

23    but he leaves out one place.  What is that?  Marelilex (ph),

24    the dirty account that he's using to do dirty business.

25              And is it a coincidence that when his brother,

1    Chidindu, is arrested and he's asked the same question --

2    these aren't trick questions.  We all answer these questions

3    every day.  What's your work history?  You all answered that

4    when we asked you during *voir dire*.  But it's interesting

5    that both of them, a year apart, when they're asked the

6    simple question of tell me what you do, tell me what your

7    work history is, leave out one thing.  Chidindu leaves out

8    Elichi Enterprises, and Chiagoziem leaves out Marelilex.

9    They leave out the companies they're using to run the fraud

10   money through.

11          And how do you know they're running fraud money?

12   Look at this.  Dwayne Carley came and testified and he said

13   "I was swindled out of a lot of money."  And when we say

14   follow the money, we are following the money.

15          On the previous slide we followed Kim Herbert's

16   money.  Kim Herbert went to Edgal Iribhogbe and Segun Adeoye.

17          And here, what do you see?  Dwayne Carley, right

18   there -- his name is there -- $13,000.  And where does it go?

19   It goes to Elichi Enterprise.  And who is Elichi Enterprise?

20   And why would Chidindu not report that he is Elichi

21   Enterprise when a court officer asks him that?  Because he

22   knows he's been running fraud money through the account.

23          Okay.  This is Donald Ortmann.  Mr. Ortmann came

24   and he testified that he lives right outside of Chicago.  He

25   runs a family business.  And he said that he was solicited

1    for an investment and that he was told there was a lot of

2    money overseas, and that if he would just provide the money

3    to do the legal work, that he would be able to access the

4    money overseas.  So repeatedly, he would provide money to

5    have the legal work done.  But ultimately what would happen

6    is there was one more thing that had to be done, one more

7    thing that had to be done.  And ultimately, he said he lost

8    over $500,000.

9           Well, what do we know?  These are the

10   communications between -- if you look here on the left, this

11   is Government's Exhibit 31C, page 740, and it's a

12   communication between Chidindu and Alex.  And what are they

13   trading?  Whose name is in there?

14          Now, counsel for Chidindu says "You won't find any

15   penny of any victim money in Chidindu's account."  But what

16   do we see in the communications that he's trading with his

17   brother?  Donald Ortmann, Mary Ann Ortmann.  And that's a

18   location, Algonquin, Illinois, right outside of Chicago.  And

19   it's a wire for $20,000.  And then in the bottom left-hand

20   corner you see what Alex's response is.  He says, "20 k?"  He

21   doesn't say, "Who's Donald Ortmann?  Who is Mary Ann

22   Ortmann?"  No.  He's like "20 k?  That's great."

23          So when he says there's not a penny in Alex's

24   account, it's a -- it's evidence of Alex's sophistication in

25   not laundering the money through the accounts in his name.

1    Rather, they're laundering it through other people's

2    accounts.  Peter Omeiri, Isaac Asare, Lisa Wilson, they're

3    using those people.

4         So this is right between the brothers, Donald

5    Ortmann, Mary Ann Ortmann, 20 K.  And it's consistent with

6    the scheme that Donald Ortmann described.  If you look in the

7    bottom right-hand corner, this is another message that's

8    traded between the brothers and we read it out loud in court.

9    "We are considering this $82,000 US dollars bank wire to your

10   Washington D.C. bank wire instructions."  It's a solicitation

11   for an investment.  They're practicing between themselves.

12        And then on this one, it's going to be a wire to

13   Washington, D.C.  This is from Chidindu to Alex.  And the

14   response that Alex has is not "What are you talking about?"

15   He says, "Washington?"  Question mark.  He's questioning.

16   We're going to wire it to Washington?  Don't you think we

17   should wire to Houston or somewhere like that?  That's his

18   only question.  Not "What are you talking about?"  He says,

19   "Washington?" Question mark.

20        Oh, yes, thick as thieves.  These two brothers are

21   involved in it and up to their eyeballs in wire fraud and

22   money laundering.

23        So what do these three cooperating witnesses tell

24   you?  You have Isaac Asare, Peter Omeiri, and Lisa Wilson,

25   and they've all three told you very similar things.  They've

1   told you that they met one or both of the brothers, and that

2   the brothers assisted them in bank accounts and urged them to

3   open additional bank accounts.  They gave the brothers their

4   account information, their account log-in information, and

5   they let them use them.  And they also, the brothers, would

6   give them bulk cash.

7          Now, I say "brothers," and that applies to Isaac

8   Asare and Peter Omeiri.  Lisa Wilson, as we know, was only

9   involved with Chidindu.  So here's what Isaac Asare said.  He

10  said he met Chidindu -- Chiagoziem, rather, Alex, through his

11  then girlfriend, Jennifer.  Then he met Gerrard at Alex's

12  house.  Alex directed him to open a business bank account or

13  business bank accounts, and gave him money to put in the

14  account.  Asare opened several accounts and provided online

15  access.  He often received bulk cash from Alex to deposit,

16  and the most was $50,000, and the least was 5,000.

17         Interestingly, Peter Omeiri independently provided

18  you with very similar information.  He met Alex and Chidindu.

19  Alex helped him set up Eastern Hardware and other bank

20  accounts, and Alex told him to lie to the bank.  What was the

21  lie that he told him to tell the bank?  That Eastern Hardware

22  was a real business.  It wasn't a real business, and Alex

23  told him to lie to the bank about it.  Omeiri opened several

24  accounts and provided online access.  He would often receive

25  bulk cash from Alex and Gerrard to deposit.

1          Then we have Lisa Wilson.  Lisa Wilson is the

2     person who was cheated, duped, swindled, in a sexual,

3     interpersonal-love way by Chidindu.  And what she said was

4     they very quickly had an intimate relationship.  He told her

5     that he loved her.  He told her it was love at first sight.

6     She thought they were going to get married.  Then he told her

7     to open bank accounts, lie to the bank, and structure

8     deposits under $10,000.

9          THE COURTROOM DEPUTY:  Fifteen minutes.

10          MS. RATTAN:  Thank you.

11          The direction to structure deposits under $10,000

12     is in the text messages between the two of them.  But he

13     instructed her to open bank accounts.  And there was a time

14     she said when she was going to deposit a lot of money into

15     her Wells Fargo Bank account, and he told her to lie to the

16     bank and tell them it's an inheritance that you got from your

17     family.  She did the same thing that Isaac Asare and Peter

18     Omeiri did.  She opened bank accounts and provided Chidindu

19     with access to her bank accounts, and she said she did bulk

20     transactions at Steve's direction.

21          So Isaac Asare doesn't know Peter Omeiri.  Peter

22     Omeiri doesn't know Lisa Wilson.  They don't know each other.

23     But look at the consistency in the information that they're

24     providing you.

25          Counsel for Chidindu and counsel for Chiagoziem

1   each say, "Why didn't Lisa Wilson get charged?  Why is Lisa

2   Wilson not facing charges?"  Well, most of the crimes that we

3   heard about in this case were committed online, where

4   somebody was seduced and told that they were loved and asked

5   to give money.  Lisa had the unfortunate fate of it not

6   happening to her online.  She met a swindler and a cheat in

7   person, Chidindu, who told her his name was "Steve."  He told

8   her that he loved her.  She had sex with him.  He said he

9   wanted to marry her, and he manipulated her.

10  He manipulated -- what did he have her in his phone as?  Was

11  it "Lisa Love"?  Was it "Lisa Wilson"?  In his phone, it was

12  "Lisa Wells Fargo."  That's how he thought of her, somebody

13  else that he could use.

14          So Lisa and Peter and Isaac all tell you that "I

15  opened accounts and I let them use the accounts."  And what

16  do we see?

17          We see victim Richard Danner.  He came and

18  testified that he fell in love with somebody online and that

19  they asked him to send money, and he did that.  And what do

20  we know about where his money went?  Again, follow the money.

21  You look at what Isaac Asare tells you; he gave them access

22  to his online accounts.  And you track Richard Danner's

23  money.  There it is right there.  Isaac Asare's bank account,

24  Government's Exhibit 155, it's Isaac Asare's money -- rather,

25  it's Richard Danner's money going into Isaac Asare's account.

1   And Isaac Asare told you what Peter Omeiri told you, what

2   Lisa Wilson told you, that they gave them access to their

3   bank accounts.

4           Here's another example.  Kim Herbert sent $25,000

5   two times to Edgal Iribhogbe, and that's the money that Segun

6   Adeoye sent internationally.

7           But bringing the whole conspiracy together, Kim

8   Herbert didn't just send money to Edgal and Sandra Iribhogbe.

9   She also sent $100,000.  And here's her $100,000.  This is

10  Government's Exhibit 155, and it's Isaac Asare's bank

11  account.  See that at the very top?  It says "Kim Herbert

12  Trust."  Kim Herbert.  Okay.  And then what happens?

13  $50,000, $50,000 goes out internationally.  And that's after

14  Isaac Asare's telling you who's controlling his accounts.

15  And again, why should you believe him?  He's accepted

16  responsibility.  He says "Judge Mazzant's going to decide

17  what my punishment's going to be."  He didn't agree with the

18  government or what the loss amount was, who the victims were,

19  how many victims there were.  Judge Mazzant's going to make

20  those decisions.

21          But what he did do is he accepted responsibility

22  and said, "I'm guilty of conspiracy.  I didn't commit the

23  crime alone.  I gave access to my bank accounts to those two

24  brothers."  And here's what you see.  Kim Herbert's $100,000

25  comes in and it goes out.  Follow the money.

1          Another example.  You remember Jim Ellett.  Jim

2    Ellett was married for 47 years.  He is a military veteran.

3    He lost his wife.  And he met somebody online, and that

4    person asked him for multiple things, thousands of dollars.

5    And he gave them so much money that he even sold his house,

6    and he's living in a camper now.  That's Jim Ellett's story.

7          When you follow the money and you ask what happened

8    to Jim Ellett's money, you look in Isaac Asare's bank account

9    and you see Jim Ellett's money, $40,000.  It comes in on

10   November 26.  Where does it go on that same day?  Does this

11   corroborate what Isaac Asare is telling you, that he gave

12   access to the Okeke brothers to his account?

13         Look on that very same day, November 26, $9,600

14   goes out to Elichi Enterprise.  And on the very next day,

15   $9,600 goes out again to Chidindu Okeke.  And then there's

16   the international wire transfer of $30,000.

17         So when you look at the evidence and you consider

18   what the lies are in the evidence and who's telling the

19   truth, these are just some examples of the money that's been

20   tracked to the defendant's bank accounts.  You've got Dwayne

21   Carley's money going directly to Elichi Enterprises.  You've

22   got the other victims's money going through Isaac Asare's

23   account to these defendants.

24         And then you've got Chiagoziem Okeke and Chidindu

25   trading information about the $20,000 that the Ortmann family

1  has sent in thinking that they're making an investment.  Is

2  that tracking the money?  Is that following the money?  Do we

3  know where the money went?  Yes, we do.

4        Here's the thing.  Here's what we know.  If you're

5  scammed and if you're swindled, and if you fall for the lies

6  that they've told you, there's going to be another victim --

7  we'll start another row right down here of victims -- because

8  today in this case there's only twelve people who stand

9  between these four defendants and the next row of victims.

10  That's what's going to happen.  Because they are scammers and

11  they are swindlers.

12        Does the evidence have to show that they were the

13  ones actually talking to Richard Danner or Kim Herbert?  No,

14  because you can mask that.  You can use VPNs.  There's any

15  number of ways to mask who it is who's talking to the person

16  and actually requesting the money.  But what you can't hide

17  is where the money goes, and that's what we know here.

18        We know where the victims' money went.  It went to

19  Edgal Iribhogbe.  It went to Segun Adeoye.  It went to

20  Chidindu Okeke and Chiagozieum Okeke.  Follow the money,

21  track the money.  One thing that never lies is the bank

22  accounts -- they'll be the same five years from now -- and

23  the communications.

24        And when you look at the communications between the

25  two brothers, what you see is "dating?  40 percent?"  He's

1    not saying "We don't want to participate."  The reason why

2    Kingsley Iheme, the translator, came to testify is to clear

3    that up.  He doesn't even -- he didn't identify them as

4    Chiagoziem or Chidindu.  He said "blue bubble, green bubble."

5    He doesn't have a fight here.  He came to explain what the

6    language is.  And what he said when he testified was that

7    this was not a conversation between people who didn't want to

8    participate.  He said they were negotiating over percentages.

9    And the question was "dating?  40 percent?"  Yeah, that's

10   what they're talking about, how much money they're going to

11   get off a dating swindle where all these people lost their

12   money.  That's what they're talking about.  Those

13   communications don't lie.

14           So they're talking about the Ortmanns.  They're

15   talking about dating, 40 percent.  They trade account

16   information.  There's the text messages or WhatsApp messages

17   between the two of them where they're providing account

18   information.  They've drafted this $82,000 swindle letter

19   that they're trading between the two of them.  Those are all

20   evidence of exactly what was going on in this case.

21           Chidindu.  Chidindu took the stand.  He lied about

22   his relationship with Lisa Wilson.  He testified one

23   afternoon that he didn't have a relationship with her and he

24   didn't have sex with her.  And then he came back the next

25   morning and was asked the question by his attorney, "Maybe I

1    didn't state the question correctly.  Let me ask you again.

2    Did you have a relationship with Lisa Wilson?"  And it was

3    only then that he admitted it.  He did have a relationship

4    with Lisa Wilson.  He used her.  He used her bank account.

5    He used her to get other -- run money through her accounts.

6         Counsel for the attorneys talk -- defendants,

7    rather, talk about the tax information.  The tax information

8    is important because it shows you the volume of money that

9    was running through each four of these defendants' accounts.

10   And when you don't report on your taxes what's happening in

11   your bank accounts, there's a reason.  You're hiding.  You're

12   concealing.  And in this case, what they were hiding and

13   concealing was a large-scale long-term international

14   conspiracy to commit wire fraud and launder money.

15        Now, do you have to believe that it was large scale

16   and long term?  No.  Because Judge Mazzant is going to tell

17   you that the only thing that's required is that you find that

18   each defendant on one occasion entered into an agreement to

19   commit the crime.  That's it.  That's all you have to find.

20   One time.

21        Segun Adeoye, one time.  He didn't get money.  He

22   was swindled by the swindlers.  He didn't get money out of

23   it.  But you know he's a fraudster based on his PMP

24   information and the fact that he won't provide documentation

25   for why those pills were issued.

1              THE COURTROOM DEPUTY:  Four minutes.

2              MS. RATTAN:  Thank you.

3              As I said, today, as you all deliberate, we'll ask

4    you to focus, of course, on what the witnesses said, Peter

5    Omeiri, Isaac Asare, Lisa Wilson.  That's important.  And

6    Benedicta Atakare told you exactly what Edgal Iribhogbe did.

7              But what we'll ask you to especially focus on are

8    the communications and the bank records because those are the

9    things that show you exactly what the defendants did.  And as

10   I said before, they are sophisticated, they are well-spoken

11   and well-educated, and they will try to scam you.  Don't let

12   them do it.  Because it's only the twelve of you who can stop

13   them now.  Find them guilty.

14             (Conclusion of closing arguments at 3:11 p.m.)

15                    *    *    *    *    *

16

17

18

19

20

21

22

23

24

25

1             CERTIFICATE OF OFFICIAL REPORTER

2

3

4             I, Gayle Wear, Federal Official Court Reporter, in

5    and for the United States District Court for the Eastern

6    District of Texas, do hereby certify that pursuant to Section

7    753, Title 28 United States Code, that the foregoing EXCERPT

8    OF JURY TRIAL is a true and correct transcript of the

9    stenographically reported proceedings held in the

10   above-entitled matter and that the transcript page format is

11   in conformance with the regulations of the Judicial

12   Conference of the United States.

13

14                 Dated 10th day of April 2024.

15

16

17             /s/ Gayle Wear
               GAYLE WEAR, RPR, CRR
18             FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25