Case 4:21-cr-00253-ALM-BD   Document 1526   Filed 10/10/24   Page 1 of 30 PageID #:
11641
Excerpt - Direct and Redirect of Benedicta Atakere      1

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF TEXAS
 2                        SHERMAN DIVISION

 3    UNITED STATES OF AMERICA      | DOCKET 4:21-CR-253
                                    |
 4    VS.                           |
                                    | FEBRUARY 28, 2024
 5    EDGAL IRIBHOGBE, SEGUN ADEOYE, |
      CHIDINDU OKEKE, AND CHIAGOZIEM |
 6    KIZITO OKEKE                  | SHERMAN, TEXAS

 7    --------------------------------------------------------

 8             VOLUME 1 OF 1, PAGES 1 THROUGH 30

 9         REPORTER'S TRANSCRIPT OF JURY TRIAL EXCERPT
        DIRECT AND REDIRECT EXAMINATION OF BENEDICTA ATAKERE
10
              BEFORE THE HONORABLE AMOS L. MAZZANT, III,
11             UNITED STATES DISTRICT JUDGE, AND A JURY

12    --------------------------------------------------------

13
      FOR THE GOVERNMENT:
14                        HEATHER HARRIS RATTAN
                          ANAND VARADARAJAN
15                        U.S. ATTORNEY'S OFFICE - PLANO
                          101 E. PARK BOULEVARD, SUITE 500
16                        PLANO, TX 75074

17
      FOR THE DEFENDANT EDGAL IRIBHOGBE:
18                        PHILLIP A. LINDER
                          MATTHEW HAAS
19                        BARRETT BRIGHT LASSITER LINDER PEREZ
                          3300 OAK LAWN AVENUE, SUITE 700
20                        DALLAS, TX 75219

21
      COURT REPORTER:   CHRISTINA L. BICKHAM, CRR, RDR
22                        FEDERAL OFFICIAL REPORTER
                          101 EAST PECAN
23                        SHERMAN, TX 75090

24

25        PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
        TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

 1   FOR THE DEFENDANT SEGUN ADEOYE:

 2                       JOHN HUNTER SMITH
                        WYNNE, SMITH & YOUNG, PLLC
 3                       707 WEST WASHINGTON
                        SHERMAN, TX 75092
 4

 5

 6   FOR THE DEFENDANT CHIDINDU OKEKE:

 7                       RAFAEL DE LA GARZA, II
                        THE DE LA GARZA LAW FIRM
 8                       3941 LEGACY DRIVE, SUITE 204-A192
                        PLANO, TX 75023
 9

10

11   FOR THE DEFENDANT CHIAGOZIEM KIZITO OKEKE:

12                       JAMES P. WHALEN
                        RYNE SANDEL
13                       WHALEN LAW OFFICE
                        9300 JOHN HICKMAN PARKWAY, SUITE 501
14                       FRISCO, TX 75035

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

3                                                                    PAGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 4 of 30 PageID #:
11444
Excerpt - Direct and Redirect of Benedicta Atakere          4

 1            (Open court, Defendants present, jury present.)

 2            (REPORTER'S NOTE:  Material read into the record

 3   is transcribed verbatim and, therefore, may not reflect an

 4   exact quote from the document or exhibit.)

 5            MS. RATTAN:  Your Honor, the United States calls

 6   Benedicta Atakere.

 7            THE COURT:  Ma'am, if you'll raise your right hand

 8   the best you can to be sworn in.

 9            (The oath is administered to the witness.)

10            THE COURT:  Come have a seat, ma'am.

11            Go ahead and proceed.

12            MS. RATTAN:  Thank you, your Honor.

13            DIRECT EXAMINATION OF BENEDICTA ATAKERE

14              CALLED ON BEHALF OF THE GOVERNMENT

15   BY MS. RATTAN:

16   Q.  Please state your name.

17   A.  My name is Benedicta Atakere.

18   Q.  Can you spell your last name?

19   A.  Yes, ma'am.

20            A-T-A-K-E-R-E.

21   Q.  Ms. Atakere -- am I pronouncing it correctly?

22   A.  Yes, ma'am.

23   Q.  Ms. Atakere, obviously you are in the custody of the

24   United States Marshal; is that right?

25   A.  Yes, ma'am.

1   Q.  Have you entered a plea of guilty to federal charges?

2   A.  Yes, ma'am.

3   Q.  And, in fact, did you plead guilty in this case before

4   the Court to conspiracy to commit wire fraud?

5   A.  Yes, ma'am.

6   Q.  Did you enter into a Plea Agreement with the United

7   States?

8   A.  Yes, ma'am.

9   Q.  You signed a Plea Agreement?

10  A.  The Plea Agreement, yes, ma'am.

11  Q.  And have you reviewed your Plea Agreement before coming

12  to court today with your lawyer?

13  A.  Yes, ma'am.

14          MS. RATTAN:  Your Honor, we'll offer Government's

15  Exhibit 286, which is this Defendant, Benedicta Atakere's,

16  Plea Agreement.

17          THE COURT:  Any objection?

18          MR. LINDER:  No objection.

19          MR. SMITH:  No objection.

20          MR. DE LA GARZA:  No objections, your Honor.

21          MR. WHALEN:  No objection, your Honor.

22          THE COURT:  286 will be admitted.

23          MS. RATTAN:  May we publish it?

24          THE COURT:  Yes, you may.

25                              *

 1   BY MS. RATTAN:

 2   Q.  Ms. Atakere, let me have you look to your right.  There

 3   is a screen right beside you.

 4          Do you see it?

 5   A.  Yes, ma'am.

 6   Q.  Do you see your Plea Agreement on there?

 7   A.  Yes, ma'am.

 8   Q.  It says *"United States of America versus Benedicta*

 9   *Atakere"*; is that right?

10   A.  Yes, ma'am.

11          MS. RATTAN:  And then if we can look at the last

12   page of the document, it's Government's Exhibit 286,

13   page 8.

14          Page 9.

15          286, page 11.

16   BY MS. RATTAN:

17   Q.  Okay.  Is this your Plea Agreement?  Is that your

18   signature?

19   A.  Yes, ma'am.

20   Q.  And you were represented by an attorney; is that right?

21   A.  Yes, ma'am.

22   Q.  And it also has my name representing the United States

23   Government?

24   A.  Yes, ma'am.

25   Q.  And you entered into that last October.  You signed it

 1   September, and your attorney and I signed it October; is

 2   that right?

 3   A.  Yes, ma'am.

 4   Q.  And this is the entire agreement between you and the

 5   United States?

 6   A.  Yes, ma'am.

 7          MS. RATTAN:  If we can focus on page 1 of the Plea

 8   Agreement, Government's Exhibit 286, page 1.

 9   BY MS. RATTAN:

10   Q.  As part of the Plea Agreement, did you give up the

11   rights that you have in this case?

12   A.  Yes, ma'am.

13   Q.  Did you understand that you were giving up the right to

14   plead not guilty, the right to have a trial by jury, the

15   right to have your evidence proved beyond a reasonable

16   doubt, and the right to confront and cross-examine

17   witnesses against you, and to not be forced to testify?

18          Did you understand that you were giving up those

19   rights that you have?

20   A.  Yes, ma'am.

21   Q.  And you accepted responsibility and you entered a plea

22   of guilty to Count 1 of the Indictment, charging you with

23   conspiracy to commit wire fraud; is that right?

24   A.  Yes, ma'am.

25   Q.  Now, Ms. Atakere, you said that you pled guilty.  Why

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 8 of 30 PageID #:
11848
Excerpt - Direct and Redirect of Benedicta Atakere          8

 1  did you enter a plea of guilty?

 2  A.  Because I want to do the right thing.

 3  Q.  Well, were you guilty?

 4  A.  I am guilty.

 5  Q.  Did you commit the crime?

 6  A.  Yes, ma'am.

 7  Q.  And is that why you pled guilty?

 8  A.  Yes, ma'am.

 9  Q.  Now, there were --

10  A.  I'm sorry that --

11  Q.  Pardon?

12  A.  I said I'm sorry that it happened, but it's the truth.

13  Q.  And there were further agreements between you and the

14  United States.

15          MS. RATTAN:  If we can look at, I believe, page 3.

16  286, page 3.

17          Page 4.

18          And if we can go back to 3.  That's the entirety

19  of the agreement.

20  BY MS. RATTAN:

21  Q.  Okay.  These are the further agreements that you had

22  with the United States, and these are agreements that you

23  and your attorney worked out; is that right?

24  A.  Yes, ma'am.

25  Q.  Basically, Judge Mazzant at your sentencing is going to

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 9 of 30 PageID #:
11449
Excerpt - Direct and Redirect of Benedicta Atakere          9

1   make the final decision about what your sentence will be.

2          Is that your understanding?

3   A.  Yes, ma'am.

4   Q.  Judge Mazzant is going to decide what the amount was

5   that was involved in the fraud, the amount of money that

6   you're accountable for being part of a conspiracy to steal,

7   the number of victims involved, the sophistication of the

8   scheme, the relocation of the funds to foreign

9   jurisdictions, and that victims were affected who were

10  vulnerable in age.

11         You agree that Judge Mazzant is going to make

12  decisions about that that will affect your sentence in this

13  case; is that right?

14  A.  Yes, ma'am.

15  Q.  As part of your Plea Agreement, did you also agree to

16  cooperate and provide information not just about what you

17  did but what other people did who were involved in the

18  crime with you?

19  A.  Yes, ma'am.

20  Q.  Now, based on your cooperation, has anyone promised you

21  that you will receive any benefit for telling the truth or

22  cooperating?

23  A.  No, ma'am.

24  Q.  Are you hoping that you'll receive a benefit because

25  you're cooperating?

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 10 of 30 PageID
#: 11450
Excerpt - Direct and Redirect of Benedicta Atakere          10

1    A.  If the Government wish to help me, I would be glad to

2    accept it.  But I want to tell the truth.

3    Q.  Well, do you -- do you hope that your sentence will be

4    reduced?

5    A.  I pray so.

6    Q.  Of course.

7         Do you know ultimately who would decide if your

8    sentence were reduced based on your cooperation?

9    A.  The judge.

10   Q.  Do you know who your sentencing judge is?

11   A.  On my plea they said Judge Mazzant, but I don't know

12   who Judge Mazzant is.

13   Q.  This is Judge Mazzant.  You are testifying before Judge

14   Mazzant this afternoon, and he will be the judge you appear

15   before for your sentencing.

16        Do you understand that?

17   A.  Yes, ma'am.

18   Q.  And he'll be the one ultimately who will evaluate what

19   your sentence will be in this case.

20   A.  Yes, ma'am.

21   Q.  Now let's look at your Plea Agreement Addendum, which

22   is part of your Plea Agreement.

23        Now let me show you this Plea Agreement Addendum.

24   This should also have your signature on page 13.  You

25   signed that along with your attorney, and I signed it as

1   well; is that right?

2   A.  Yes, ma'am.

3          MS. RATTAN:  And then if we can go back to

4   page 12.  286, page 12.

5   BY MS. RATTAN:

6   Q.  This talks about substantial assistance.  Basically,

7   it's your cooperation with the Government and this is your

8   agreement with the Government, substantial assistance.  And

9   it says:  "If, in its sole discretion, the Government

10  determines that the Defendant has provided substantial

11  assistance in the investigation or prosecution of others

12  and has otherwise complied with the terms of this

13  agreement, the Government may file a motion for downward

14  departure pursuant to these rules.  The Defendant's

15  cooperation does not automatically require the Government

16  to request a downward departure or reduction in sentence,

17  and the time for filing of such a motion will be determined

18  by the Government."

19          And, finally, Ms. Atakere, your agreement is that

20  it will be entirely within the Court's -- Judge

21  Mazzant's -- discretion as to what, if any, reduction you

22  might receive based on your cooperation.

23          Do you understand that?

24  A.  Yes, ma'am.

25  Q.  Now, Ms. Atakere, tell us about your background.  Where

```
 1  are you from?  Where were you born, and where did you grow

 2  up?

 3         THE COURT:  Ms. Rattan, why don't we at this point

 4  take the afternoon break, if that's okay.

 5         So, ladies and gentlemen, we'll take our afternoon

 6  break.  Again, please don't discuss the case among yourself

 7  or anyone else.  Don't do any outside research.  We'll take

 8  about 15 minutes and come back and continue.  Thank you.

 9         (The jury exits the courtroom, 3:06 p.m.)

10         THE COURT:  Anything further from the Government?

11         (No audible response.)

12         THE COURT:  Anything further from the Defense?

13         MR. WHALEN:  Your Honor, I know we -- I thought we

14  had an agreement that we would kind of know what the

15  batting lineup is today -- each day, and it was news to us

16  we were getting a cooperating witness.  So in the future,

17  we would like to be apprised of this so we could be

18  properly prepared, so that's just my request.

19         THE COURT:  Okay.  That doesn't impact anything

20  going forward right now so -- okay.  Well, y'all can --

21         MS. RATTAN:  Your Honor, may I be heard?

22         I apologize to Counsel.  What happened was we were

23  going to call just victims, but we received information at

24  lunch that one of the victims missed his flight here.  And

25  we were going to call that victim and then put Agent
```

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 13 of 30 PageID
#: 11453
Excerpt - Direct and Redirect of Benedicta Atakere        13

1   Matthews back on to do another victim summary, and we

2   didn't think we would reach this witness today.  But

3   because the witness missed his flight, our schedule was

4   thrown off.

5          THE COURT:  Okay.  I understand.

6          MR. DE LA GARZA:  Your Honor, then there is one

7   other issue.  It's my understanding she was recently

8   interviewed by the Government, and we have not -- I have no

9   idea what she told the Government in this interview, so we

10  might need a little bit more time.  So maybe we could ask

11  the Government to give us a *Reader's Digest* version of

12  something that should have been turned over to us under

13  normal circumstances.  I understand things come up, but I

14  would like to know a little bit before we get into it.

15         THE COURT:  For her recent meeting with her report

16  preparer?

17         MS. RATTAN:  No, there wasn't.  We were there --

18  Mr. Varadarajan and I were there, and there wasn't a

19  report.  And there was an agent present, but a 302 wasn't

20  done.

21         THE COURT:  Okay.  That answered that.

22         MR. DE LA GARZA:  I don't even know if there is a

23  presentence report done because normally we get those.

24         MR. LINDER:  There is.

25         MR. DE LA GARZA:  There is?

Case 4:21-cr-00253-ALM-BD   Document 1526   Filed 10/10/24   Page 14 of 30 PageID
#: 11454
Excerpt - Direct and Redirect of Benedicta Atakere          14

 1              MR. LINDER:  We got that on Friday.

 2              MR. DE LA GARZA:  Okay.  Thank you, Judge.

 3              MS. RATTAN:  We just received the presentence

 4     report last week, and I believe we put it in and provided

 5     it.

 6              MR. LINDER:  We got it.

 7              MS. RATTAN:  And the Court gave permission on

 8     Friday for us to provide it.

 9              THE COURT:  I understand.

10              Okay.  15-minute break.

11              (Recess, 3:09 p.m. to 3:26 p.m.)

12              (Open court, all Defendants present, jury

13     present.)

14              THE COURT:  Please be seated.

15              Ms. Rattan, go ahead and continue.

16              MS. RATTAN:  Thank you, your Honor.

17     BY MS. RATTAN:

18     Q.  Ms. Atakere, I was just asking you to tell us where you

19     were born and where you grew up.

20     A.  Nigeria.

21     Q.  In Nigeria?

22     A.  Yes, ma'am.

23     Q.  At some point did you come to the United States?

24     A.  Early 2000, ma'am.

25     Q.  Pardon?

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 15 of 30 PageID
#: 11455
Excerpt - Direct and Redirect of Benedicta Atakere        15

 1  A.  2001.

 2  Q.  In 2001, you came to the United States?

 3  A.  Yes, ma'am.

 4  Q.  Can you pull the microphone a little closer to you?

 5  A.  Yes, ma'am.

 6  Q.  So in 2001, you came to the United States.

 7          And can you tell the jury what types of jobs you

 8  had?

 9  A.  I have worked as nursing assistant.  I have worked as

10  armed security.  I cater as well on the side.

11  Q.  And what on the side?

12  A.  I cater.  I cook.

13  Q.  Oh, a cook?

14  A.  Yes, ma'am.

15  Q.  So you did some nursing assistant --

16  A.  Assistant, home health aide, yes, ma'am.

17  Q.  And cooking?

18  A.  Some cooking.

19  Q.  I mean, you've been here since 2001.  So how old were

20  you when you left Nigeria?

21  A.  24.

22  Q.  24.

23  A.  Twenty -- yeah, twenty -- I can't think.

24  Q.  In your 20s?

25  A.  I just turned 49 so --

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 16 of 30 PageID
#: 11456
Excerpt - Direct and Redirect of Benedicta Atakere                16

 1    Q.  You're 49 now?

 2    A.  Yes, ma'am.

 3    Q.  And you left Nigeria at some point in your 20s?

 4    A.  Yeah.

 5    Q.  So in terms of your life in Nigeria, did you know the

 6    term "4-1-9"?

 7    A.  Yes, ma'am.

 8    Q.  Can you tell the jury, when you hear "4-1-9," what does

 9    that mean in the Nigerian environment?

10    A.  Scam.

11    Q.  A scam?

12    A.  Yes, ma'am.

13    Q.  So if someone says, "You're 4-1-9," what does that

14    mean?

15    A.  You're a scammer.

16    Q.  You're a scammer?

17    A.  Yes, ma'am.

18    Q.  Well, at some point did you become involved in

19    scamming?

20    A.  When I met Sandra, 2018.

21    Q.  How did you meet Sandra?

22    A.  Through a cousin who introduce -- who was visiting

23    Edgal in Abu Dhabi.  And my cousin talked to me on the

24    phone and introduced Sandra and Edgal to me.

25    Q.  Okay.  And that's her husband?

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 17 of 30 PageID
#: 11457
Excerpt - Direct and Redirect of Benedicta Atakere       17

 1   A.  Yes, Edgal Irighogbe.

 2   Q.  Okay.  So you met Sandra and her husband through a

 3   cousin?

 4   A.  Yes, ma'am.

 5   Q.  After you met Sandra, did you start working with her to

 6   move large amounts of money out of the country?

 7   A.  Yes, ma'am.

 8   Q.  Can you describe for the jury what you would do?

 9   A.  So Sandra -- I took orders from Sandra.

10         And she took my account information and money

11   comes into my account and she tell me -- and send me on

12   WhatsApp address of the bank to wire to.

13         And I follow instruction, and I do that.

14   Q.  So she sent money to you, and then you would send it

15   wherever she told you to send it?

16   A.  Yes, ma'am.

17         And most time she is on the phone with me when I'm

18   at the bank.  If I can't say the China -- word right in

19   China and she walk me through on the phone and say, "Yeah,

20   this is the bank," say "This is how it's called.  This is

21   the address.  It's right."

22   Q.  So she would tell you exactly what to do?

23   A.  Yes, ma'am.

24   Q.  And were you sending it internationally?

25   A.  Yes, ma'am.

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 18 of 30 PageID
#: 11458
Excerpt - Direct and Redirect of Benedicta Atakere       18

1  Q.  And I said "large amounts of money."  Do you agree with

2  that?

3  A.  Yes, ma'am.

4  Q.  And did you do it many times?

5  A.  Absolutely, ma'am.

6  Q.  Now, we have your picture up here, Benedicta Atakere.

7          And you had a company.  It was called Eagle

8  Global; is that right?

9  A.  Yes, ma'am.

10 Q.  And did you have that business with your husband?

11 A.  Yes, ma'am.

12 Q.  What was your husband's name?

13 A.  Mathew Okpu.

14 Q.  Mathew Okpu?

15 A.  Yes, ma'am.

16 Q.  He's also a Defendant in this case?

17 A.  Yes, ma'am.

18 Q.  He's also pled guilty along with you; is that right?

19 A.  Yes, ma'am.

20 Q.  Now, you've said that over the many, many times, you

21 sent large amounts of money internationally and you were

22 working with Sandra; is that right?

23 A.  Yes, ma'am.

24 Q.  Now, you've also said that you know what 4-1-9 is and

25 you know what scamming is; is that right?

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 19 of 30 PageID
#: 11459
Excerpt - Direct and Redirect of Benedicta Atakere        19

1    A.  Yes, ma'am.

2    Q.  Now, you knew and you've entered a plea of guilty and

3    accepted responsibility for the fact that this was dirty,

4    stolen, scammed, 4-1-9 money; is that right?

5    A.  Yes, ma'am.

6    Q.  You knew that?

7    A.  Yes, ma'am.

8    Q.  Well, let me ask you about a time when Sandra sent you

9    $80,000.  It would have been in October of 2019.

10          Do you remember that time?

11   A.  Yes, ma'am.

12   Q.  Tell us what happened.

13   A.  So my account was a negative then, so the money came

14   into my account.  And I was on my way to Baltimore, and she

15   called me on the phone and said, "Oh, there is this money

16   that just went through to your account, and I need you to

17   send it to China.  I'm going to send you the information,

18   and I'm going to give you 10 percent."

19          And I said -- you know, I was a little bit like,

20   "I'm tired of this.  This is big money, 80,000, and you're

21   going to give me 10 percent?  I want more."

22   Q.  Okay.  So hold on.  She was giving you a cut, and at

23   that point it was 10 percent?

24   A.  Yes.  At the initial stage, yes, 10 percent.

25   Q.  And so she tells you on this time it's going to be

1    $80,000 moving through your account to China?

2    A.  Yes.

3    Q.  And what was your thought?  What were you thinking?

4    A.  I told her this time around that I wasn't going to send

5    the money to China.  I wasn't going to do 10 percent.

6          And she started working up, and I hung up on her.

7    We went back on the phone.  Eventually she said, "Okay.

8    Take half of the money.  Send the other half to China."

9          I said, "I am not going to send to China."

10          And she said she's going to send a uncle to

11    Maryland to come collect the balance money since I don't

12    want to send it to China.

13   Q.  So let me get this straight.  The $80,000 came into

14   your account?

15   A.  Yes, ma'am.

16   Q.  And you were frustrated?

17   A.  Yes, ma'am.

18   Q.  Upset?

19   A.  Yes, ma'am.

20   Q.  You wanted a higher percentage?

21   A.  Yes.

22   Q.  And you said, "I'm not sending it because I want a

23   higher percentage"?

24   A.  Yes.

25   Q.  So you were delaying the money?

1   A.  Yes.

2   Q.  What did you do with the money, the $80,000?

3   A.  So at some point somebody came to my door, and my

4   camera -- the surveillance camera indicated that there is

5   somebody at my door.  I wasn't home.  So I opened it up,

6   and I saw the picture of the gentleman right there

7   (indicating).

8           And then I called Sandra and said, "There is

9   somebody at my door.  You told me you were going to send

10  somebody.  Is the person at my door?"  And I sent the

11  picture back to her.

12          And she said, "That's my husband.  Yes."

13          And then I hung up on her.

14  Q.  So why had she told you she was going to send somebody?

15  A.  Because when we started going back and front on the

16  percentage agreement thing and she wasn't working -- she

17  wanted me to send the whole money to China for PVC pipe and

18  all that, and then she -- I wasn't -- I'm like, "Okay.

19  Sandra, I've been doing this for you for a long time and

20  you want to do this to China and I already told you I don't

21  want to do it.  So if you already put the money there, it's

22  on you.  But if you -- if I'm really going to do it, you're

23  going to -- you're going to up me on the percentage."

24          And I say she was dragging with me.  She doesn't

25  want to do it, and she want to give me the money in naira

1  in Nigeria.  And that period was a little bit odd time.  I

2  don't want to take the money in naira in Nigeria; I want to

3  take the money in dollars because now I see the money is

4  right there.

5          And she -- we went back and front and she said,

6  "Okay.  You know, I'm going to send somebody to come."

7          I said, "Sandra, we've been dealing on the phone.

8  I would like for you to come.  Let me see you one-on-one."

9          And then she say she can't make it but her husband

10 is coming from Abu Dhabi, you know, she would see if the

11 husband can make it.  And then she sent this, that the

12 uncle was going to make it, make the trip.

13         And then somebody showed at my door, and I sent

14 the picture because I don't know who this man was.  And he

15 called me on the phone and said, "I'm Sandra's husband,"

16 with Abu Dhabi number.

17         And then I called Sandra and I say, "I just sent

18 you a picture from my door.  Who is this person?  You sent

19 the message and said your husband is coming."

20         MR. SMITH:  Your Honor, I object.  This is --

21 A.  And she said, "That's my husband."

22         THE COURT:  Wait just a second.

23         THE WITNESS:  Oh, sorry.

24         MR. SMITH:  I'm going to object.  She's testifying

25 in the narrative.

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 23 of 30 PageID
#: 11463
Excerpt - Direct and Redirect of Benedicta Atakere        23

1          THE COURT:  Well, go ahead and ask another

2    question, Ms. Rattan.

3    BY MS. RATTAN:

4    Q.  Ms. Atakere, what had you done with the $80,000 at that

5    point?

6    A.  So I took -- when she give me go-ahead to give the

7    money to her husband, so I took 30,000 out of the money,

8    and the 50,000 I gave to Edgal Irighogbe.

9    Q.  You gave $50,000 back to him?

10   A.  Yes.

11   Q.  Where did this happen?

12   A.  It happened in Maryland, Temple Hills, Maryland, on

13   Saint Moritz Drive.  That's where I live.

14   Q.  That's where you and your husband, Mathew Okpu, live?

15   A.  Yes, ma'am.

16   Q.  Why did you give $50,000 to Sandra's husband,

17   Mr. Irighogbe?

18   A.  Because Sandra instructed me to do so.

19   Q.  She told you to give him the $50,000?

20   A.  Yes.

21   Q.  Now, before Edgal Irighogbe came to collect the $50,000

22   from you, were there text messages exchanged and arguments

23   about what was going on?

24   A.  Yes.

25   Q.  And was your husband, Mathew Okpu, involved in it and

1  was Sandra involved in it?

2  A.  Yes.

3          MS. RATTAN:  Your Honor, may we publish

4  Government's Exhibit 23B-5003?

5          THE COURT:  Yes, go ahead.

6  BY MS. RATTAN:

7  Q.  Now, this is November 6th of 2019 and this was taken

8  off of Sandra's phone and Sandra is talking to Mathew Okpu.

9          Is that your husband?

10  A.  Yes, ma'am.

11  Q.  And Sandra says:  "Why are you not returning the funds?

12          "Return the funds, no.

13          "Stay by your word, no.

14          "Act respectfully, no.

15          "Comply and do the right thing."

16          What's going on here?

17  A.  This was because I wouldn't send it to China and all

18  that, and then she -- she was angry because this time

19  obviously I wasn't -- I was a little bit stubborn and

20  hotheaded with her.  And she didn't like it, and she was

21  doing that, and she wanted me to send the money to China.

22  Q.  And then there's reference to:  "I would appreciate you

23  end calling my husband."

24          And this is all on November 6th of 2019; is that

25  right?

1    A.  Yes.

2    Q.  And then more down here.  Sandra, to your husband,

3    says:  "You can go to Trump and the chief of the FBI for

4    all I care.  You and your wife" -- talking to your husband

5    about you -- "would go down as well.  You have not seen

6    where this map would take everyone because of greed."

7              Why is she saying that if you and your husband

8    report what's going on, you're going to go down, too?

9    A.  So now --

10   Q.  Were you involved in the crime?

11   A.  I was -- technically that's what it is because I was

12   taking order from her.  I don't know who else she is

13   reporting to, and she told me it's a family business

14   between she and her husband.  So I don't -- and I've never

15   met all those people, so I don't know if she was just

16   making just an empty threat.

17             And you can just be using me and sending me and

18   I'm doing all that.  And if I said I want a raise and the

19   money is sitting right there, I don't know -- I don't know

20   why she can't do it.

21   Q.  So you're getting a percentage historically, but you

22   wanted more; is that right?

23   A.  Yes, ma'am.

24   Q.  So let me show you Government's Exhibit 23B-5004, and

25   this is from your husband to Sandra.

1          And he says:  "I can assure you on this, that you

2  will see how cheaply you, your husband, and your

3  international fraud group will go down on this.

4          "At the time you are picked up for questioning for

5  sending someone to threaten me for nothing, you will

6  understand."

7          What's going on here?  What is your husband

8  saying?

9  A.  So at this time somebody left a voice message for my

10  husband and was threatening that they're going to send --

11  they're going to come after us, like threatening.

12          And then that was when my husband sent this

13  message.

14  Q.  Okay.  And he says:  "The whole international fraud

15  group is going to go down on this one if you start causing

16  trouble"; is that right?

17  A.  Yes.

18          MS. RATTAN:  And then let's look at 23B-5004.

19  BY MS. RATTAN:

20  Q.  And this is from Sandra to your husband and she says:

21  "You keep talking about authorities.  We would all go down.

22  No doubt.  Return the funds, and let's all go our separate

23  ways."

24          Is that right?

25  A.  Yes.

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 27 of 30 PageID
#: 11467
Excerpt - Direct and Redirect of Benedicta Atakere        27

1    Q.  And there's more messages between Sandra and your

2    husband about you and her husband, but this is a

3    representative example of what was happening; is that

4    right?

5    A.  Yes, ma'am.

6    Q.  So you detain the money.  You keep the money, and she

7    sends somebody to get it back from you?

8    A.  Yes.

9    Q.  And you were telling us who came.

10   A.  Can you say that again, ma'am.

11   Q.  Who came to get the money from you?

12   A.  Edgal.

13   Q.  Her husband?

14   A.  Her husband, yes.

15   Q.  And a minute ago you were trying to point.  Can you

16   tell us, when you say "her husband," do you see that person

17   in the courtroom today?

18   A.  Right here (indicating), the -- this man, the

19   bald-headed black man right there.

20   Q.  If this is Person --

21   A.  Yes.

22   Q.  -- Number 1 -- okay.

23          MS. RATTAN:  Your Honor, may the record reflect

24   that the witness has identified the Defendant Edgal

25   Irighogbe.

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 28 of 30 PageID
#: 11468
Excerpt - Direct and Redirect of Benedicta Atakere        28

1          THE COURT:  The record will so reflect.

2  BY MS. RATTAN:

3  Q.  So describe for us what happened when he came to your

4  house.

5  A.  So why -- the first time when I sent the picture

6  message to confirm who the person was, I want to make sure,

7  too, that when I release the money, I want to make sure I'm

8  giving the money to the right person.

9          So when Sandra confirms that, so -- I wasn't home

10  and I got other message.  And he told me he was lodged in

11  some hotel in Camp Springs area.  And Camp Springs around

12  Temple is area which is like -- it's a little -- it's about

13  12, 15 minutes from me.  I can't remember the name of the

14  hotel.

15          And the next day or couple of days later, he came,

16  and then I agree to meet with him down the street.  So I

17  gave him the money, $50,000.

18  Q.  So you saw him once when he came to your house, and

19  then you met him personally?

20  A.  Yes.

21  Q.  How did you know that that was the right person to give

22  the money to?

23  A.  Just the same way.  Somebody I saw then.  After three

24  years of being in jail, I see him and I know him.  It's the

25  same way.  I don't have any doubt.  That's Edgal Irighogbe

Case 4:21-cr-00253-ALM-BD   Document 1526   Filed 10/10/24   Page 29 of 30 PageID
#: 11469
Excerpt - Direct and Redirect of Benedicta Atakere      29

1   right there.

2   Q.   Okay.

3   A.   I know him.

4   Q.   And that's who you returned the 4-1-9 money to?

5   A.   Yes, ma'am.

6            MS. RATTAN:   I'll pass the witness.

7            THE COURT:   Cross-examination?

8            (Proceedings occurring at this point are omitted

9   from this excerpted transcript.)

10           THE COURT:   Additional questions, Ms. Rattan?

11           MS. RATTAN:   Just briefly.

12              REDIRECT EXAMINATION OF BENEDICTA ATAKERE

13  BY MS. RATTAN:

14  Q.   Ms. Atakere, the $80,000 that you held back, it was in

15  your account and in your possession for a while; is that

16  right?

17  A.   Yes.

18  Q.   How long would you estimate?

19  A.   Couple of weeks.

20  Q.   And it was there a couple of weeks because you were

21  holding it back because you were frustrated about getting

22  paid.

23  A.   Yes, ma'am.

24  Q.   Is that fair to say?

25  A.   Yes, ma'am.

Case 4:21-cr-00253-ALM-BD    Document 1526    Filed 10/10/24    Page 30 of 30 PageID
#: 11470
Excerpt - Direct and Redirect of Benedicta Atakere        30

1   Q.  Now, the Defense Counsel asked you about being in jail

2   with Sandra, and you said you didn't want to talk to

3   Sandra.

4   A.  Yes, ma'am.

5   Q.  While you were in jail, did Sandra say anything to

6   you --

7           MR. SMITH:  Objection, leading.

8   A.  Yes.

9           THE COURT:  Overruled.

10  BY MS. RATTAN:

11  Q.  While you were in jail, did Sandra say anything to you?

12  A.  Yes, ma'am.

13  Q.  What did she say?

14  A.  She told me I shouldn't say anything about her husband.

15          MS. RATTAN:  I'll pass the witness.

16          (Excerpt of proceedings concluded.)

17  COURT REPORTER'S CERTIFICATION

18          I HEREBY CERTIFY THAT ON THIS DATE, OCTOBER 10,

19  2024, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

20  OF PROCEEDINGS.

21          ___/s/_____
                CHRISTINA L. BICKHAM, CRR, RDR
22

23

24

25